**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Name **LEWIS,          ERIC          M.**
_____
(Last)          (First)          (Initial)

Prisoner Number **E-29675** _____

## ORIGINAL

Institutional Address ___**P.O. BOX 689, SOLEDAD, CA 93960-0689**___

## FILED

JUN 1 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**ERIC LEWIS**
_____
(Enter the full name of plaintiff in this action.)

vs.

**B. CURRY, WARDEN, et al**
_____
_____
_____
_____
(Enter the full name of respondent(s) or jailor in this action.)

## CV 08    3009

Case No. _____
(To be provided by the clerk of court)

**PETITION FOR A WRIT**
**OF HABEAS CORPUS**
**Evidentiary Hearing Requested**

MMC

(PR)

E-filing

**Read Comments Carefully Before Filling In**

**When and Where to File**

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS          - 1 -

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now **and** the Attorney General of the state in which the judgment you seek to attack was entered.

## A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

    (a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

    <u>Los Angeles Superior Court,</u>    <u>North Valley</u>
    Court                                  San Fernando, CALIFORNIA
                                           Location

    (b) Case number, if known ____<u>A712325</u>____

    (c) Date and terms of sentence <u>7/22/89  27 years to life</u>

    (d) Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.)    Yes <u>x</u>____    No _____

    Where?

    Name of Institution: <u>CORRECTIONAL TRAINING FACILITY</u>

    Address: <u>P.O. BOX 689, SOLEDAD, CA 93960-0689</u>

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

   <u>PC § 187, PC § 12022.5</u>

   _____

   _____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

    Arraignment:                    Yes _X_    No _____

    Preliminary Hearing:          Yes _X_    No _____

    Motion to Suppress:         Yes _____    No _X_

4. How did you plead?

    Guilty _X_    Not Guilty _____    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury _____    Judge alone _____    Judge alone on a transcript _____

6. Did you testify at your trial?        Yes _____    No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment               Yes _X_    No _____

    (b)    Preliminary hearing      Yes _X_    No _____

    (c)    Time of plea               Yes _X_    No _____

    (d)    Trial                     Yes _____    No _X_

    (e)    Sentencing               Yes _X_    No _____

    (f)    Appeal                  Yes _____    No _X_

    (g)    Other post-conviction proceeding    Yes _____    No _X_

8. Did you appeal your conviction?        Yes _X_    No _____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal           Yes _X_    No _____

        Year: _1983_    Result: ____DENIED_____

        Supreme Court of California    Yes _X_    No _____

        Year: _1994_    Result: ____DENIED_____

        Any other court           Yes _____    No _X_

        Year: _____    Result: _____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS    - 3 -

petition?                              Yes _____   No _X___

(c)   Was there an opinion?            Yes _X_   No_____

(d)   Did you seek permission to file a late appeal under Rule 31(a)?

Yes _____   No_____

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?   Yes _X_   No_____

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a)   If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court: __LOS ANGELES SUPERIOR COURT__

Type of Proceeding: __Habeas Corpus__

Grounds raised (Be brief but specific):

a. __Violation of State and Federal Due Process__

b. __Violation of Plea Bargain__

c. __No Parole Policy__

d. _____

Result: __Denied__        Date of Result: __12/21/07__

II.   Name of Court: __SECOND DISTRICT APPELLATE COURT__

Type of Proceeding: __Habeas Corpus__

Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 4 -

1        a. <u>State and Federal Due Process Violations</u>

2        b. _____

3        c. _____

4        d. _____

5        Result: __Denied_____ Date of Result: 3/06/08

6   III.  Name of Court: California State Supreme Court

7        Type of Proceeding: Petition for Review

8        Grounds raised (Be brief but specific):

9        a. State and Federal Due Process Violations

10       b. _____

11       c. _____

12       d. _____

13       Result: __Denied_____ Date of Result: May 14, 2008

14  IV.  Name of Court: _____

15       Type of Proceeding: _____

16       Grounds raised (Be brief but specific):

17       a. _____

18       b. _____

19       c. _____

20       d. _____

21       Result: _____ Date of Result: _____

22  (b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?

23       Yes ____   No  X

24     Name and location of court: _____

25  **B. GROUNDS FOR RELIEF**

26  State briefly every reason that you believe you are being confined unlawfully. Give facts to

27  support each claim. For example, what legal right or privilege were you denied? What happened?

28  Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS       - 5 -

need more space. Answer the same questions for each claim.

[Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C §§ 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

Claim One: **The Board and State Courts violated Petitioner's Due Process Rights by denying him parole without the requisite "some evidence".**

Supporting Facts: **Please see attached Memorandum of Points and Authorities for facts and supporting cases.**

Claim Two: **The Board and State Courts violated Petitioner's Due Process Rights by denying him parole based on a blanket No Parole Policy for murders.**

Supporting Facts: **Please see attached Memorandum of Points and Authorities for facts and supporting cases.**

Claim Three: **The Board and State Courts violated Petitioner's Due Process Rights by denying him parole by recharactering his crime as one carrying a more severe sentence.**

Supporting Facts: **Please see attached Memorandum of Points and Authorities for facts and supporting cases.**

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

**All grounds were timely presented to the State Courts.**

PET. FOR WRIT OF HAB. CORPUS        - 6 -

Additional Claims

**Claim Four:** <u>The Board and State Courts violated Petitioner's Due Process Rights by denying him parole based on the Motive.</u>

**Supporting Facts:** <u>Please see attached Memorandum of Points and Authorities for facts and supporting cases.</u>

**Claim Five:** <u>The Board and State Courts violated Petitioner's Due Process Rights by failing to recognize, honor and enforce his Plea Bargain.</u>

**Supporting Facts:** <u>Please see attached Memorandum of Points and Authorities for facts and supporting cases.</u>

page 6a

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3  of these cases:

4  **Please see attached Memoradum of Points and Authorities** _____

5  _____

6  _____

7  Do you have an attorney for this petition?                    Yes_____    No__X__

8  If you do, give the name and address of your attorney:

9  _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on __23 MAY 2008__                    _____

14              Date                                    Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

Eric M. Lewis   E29675
PO Box 689      B-237L
Soledad, California 93960-0689
    In pro per

**ORIGINAL**

### UNITED STATES DISCTRICT COURT

### FOR THE NORTHERN DISTRICT

| | |
|---|---|
| ERIC M. LEWIS       ) <br>    PETITIONER      ) <br>              ) <br>              ) <br>   -V.-          ) <br>              ) <br> B. CURRY WARDEN, et al  ) <br>    RESPONDENT      ) <br> _____ ) | Case No.: _____ <br><br> **RE: MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPPORT OF PETITION FOR WRIT OF HABEAS CORPUS** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

                    TABLE OF CONTENTS

2  Cover page

3  Table of Contents                              i-ii

4  Table of Authorities                           iii-vii

5  Preface                                        1-3

6  Memorandum of Points and Authorities           4-48
   Ground 1                                       4-16
7       A. PURPOSE OF THE BOARD'S HEARING          4-5
        B. PAROLE BOARD DECISION IS ONE OF EQUITY  5-6
8          AND DENIAL OF PAROLE GRANT REQUIRES
           'SOME EVIDENCE'
9       C. PAROLE BOARD'S EVALUATION CRITERIA      6-8
        D. PETITIONER'S SUITABILITY FACTORS        8-9
10      E. PETITIONER'S SUITABILITY IN TERMS OF    9-11
           TITLE 15 DIVISION 2 §2402(d) CRITERIA
11      F. FAILURE OF BOARD TO EXAMINE PETITIONER'S 11
           CURRENT CHARACTER
12      G. PETITIONER'S PSYCHIATRIC ASSESSMENT     11-12
        H. PETITIONER'S ACCEPTANCE OF             12-13
13         RESPONSIBILITY AND REMORSE
        I. THE BOARD'S DECISION FAILED TO CONSIDER 13
14         PETITIONER'S PLEA BARGAIN
        J. PETITIONER HAS PASSED HIS FIXED MINIMUM 14
15         TERM.
        K. HEARING RESULTS                        14-15
16      L. THE BOARD'S DECISION IS NOT SUPPORTED   15-16
           BY 'SOME EVIDENCE'
17   Ground 2                                      16-23
        A. PETITIONER'S DENIAL OF PAROLE WAS BASED 16-18
18         SOLELY ON THE COMMITMENT OFFENSE
        B. THE BOARD CANNOT RE-CHARACTERIZE THE    18-19
19         COMMITMENT OFFENSE
        C. PETITIONER'S POST CONVICTION RECORD     19-20
20      D. INDIVIDUALIZED CONSIDERATION            20-21
        E. PETITIONER HAS PASSED HIS FIXED MINIMUM 21
21         RELEASE DATE
        F. THERE IS NO PUBLIC OPPOSITION TO        21
22         PETITIONER'S RELEASE
        G. THERE WERE NO AGGRAVATING FACTORS FILED 21-22
23         BY PROSECUTION OR FOUND BY THE COURT
        H. CIRCUMSTANCES OF THE OFFENSE ARE NO MORE 22-23
24         THAN NECESSARY TO SUSTAIN A CONVICTION
     Ground 3                                      23-29
25      A. PETITIONER'S CASE WAS SETTLED           23-24
           VIA PLEA AGREEMENT
26      B. THE BOARD'S ACCEPTED FACTS OF THE OFFENSE 24-25
        C. THE EVIDENCE SUPPORTS ONLY THE MINIMUM  25
27      D. PETITIONER WAS UNDER STRESS AT THE TIME 25
           OF THE MURDER

28

                              i

E.  THE BOARD'S FINDINGS ARE INCONSISTENT    25-26
    WITH THE EVIDENCE ELEMENTS FOR CONVICTION
                    TABLE OF CONTENTS Continued

F.  THE BOARD'S RECHARACTERIZATIONS OF THE    26-27
    CRIME ARE THOSE USED TO DEFINE
    'SPECIAL CIRCUMSTANCES' IN PC §190.2
G.  SECOND APPELLATE DISTRICTS REVIEW OF    27-29
    SIMILAR CASES AND SOME    EVIDENCE
H.  SOME EVIDENCE STANDARD IS INAPPROPRIATE    29-30
    FOR PLEA CONVICTION
Ground 4    30-33
A.  THE BOARD'S ACCEPTANCE OF THE    31
    CIRCUMSTANCES OF THE OFFENSE
B.  FACTORS CONTRIBUTING TO THE COMMITMENT    31-32
    OFFENSE
C.  BOARD DECISION    32-33
D.  PROSECUTION'S FAILURE TO STIPULATE    32
    AT SENTENCING
Ground 5    34-46
A.  INTRODUCTION    34
B.  PLEA AGREEMENT PARTIES FUNCTIONS AND    33-35
    RESPONSIBILITIES
C.  PLEA AGREEMENTS ARE GOVERNED BY    35-36
    CONTRACT LAW
D.  IMPLIED TERMS OF PLEA CONTRACTS    37
E.  CONTRACT LAW REQUIRES LESSER PUNISHMENT    37-39
    FOR A PLEA TO A LESSER OFFENSE
F.  CONTRACT LAW REQUIRES THE RECIPROCAL    39-40
    BENEFIT OF LESSENED PUNISHMENT
G.  CALIFORNIA COURTS REQUIRE RECIPROCITY    40-41
    IN PLEA CONTRACTS
H.  PETITIONER'S BELIEF THAT "27 TO LIFE"    41-43
    MEANT 27 YEARS IN PRISON FOLLOWED BY
    LIFE ON PAROLE WAS REASONABLE
I.  PETITIONER'S REAL UNDERSTANDING OF THE    43-45
    MEANING OF THE PLEA BARGAIN IS SUPPORTED
    BY DOCUMENTATION PROVIDED BY THE DEPARTMENT
    UPON INITIAL PROCESSING
J.  THE UNITED STATES SUPREME COURT HAS LONG    45-46
    HELD THAT PLEA BARGAINS MUST BE ENFORCED
K.  THE DEFENDANT SHOULD BE GRANTED SPECIFIC    46
    PERFORMANCE OF HIS PLEA BARGAIN

CONCLUSION    47

PRAYER FOR RELIEF    48
PROOF OF SERVICE    49

ii

TABLE OF AUTHORITIES

AUTHORITY                                              PAGE

CONSTITUTIONAL AUTHORITIES

California Constitution Article I, Section 15     passim

United States Constitution, Amendments 5 & 14     passim

FEDERAL STATUTE

§2254(D)(1)                                            2

§2254(D)(2)                                            2,3

FEDERAL CASE LAW

Anthony v. Cambra, (9th Cir. 2000)                    3
  236 F.3d 568

Biggs v. Terhune (9th Cir 2003)                       5,15,16,20
  334 F.3d, 910

Blakely v. Washington (2004)                          18
  124 S.Ct. 2531; 159 L.Ed.2d 403

Brady V. United States (1970)                         34,39,41
  347 U.S. 742

Brown v., Poole (9th Cir. 2003)                       36
  337 F.3d 1155

Buckley v. Terhune (9th Cir. 2006)                    35
  444 F.3d 688

Corbit v. New Jersey (1978)                           40
  489 U.S. 212

Concrete Pipe & Prod. v. Const. Laborers Pen.         3
  (1983) 113 S.Ct. 2264

Cunningham v. California (2007)                        18
  127 S.Ct. 856

Demosthenes v. Baal (1990)                            3
110 S.Ct. 2223

Eyre v. Potter                                        13
  56 U.S. 42

Giglio v. United States (1972)                        35,37
  150 U.S. 150

iii

1

## TABLE OF AUTHORITIES

2

AUTHORITY                                                    PAGE

3
Hayward v. Marshall (9th Cir. 2008)                          6
  512 F.3d 536

4

Irons v. Carey (9th Cir. 2007)                               15
5  479 F.3d 658

6
Irons v. Carey (9th Cir. 2007)                               6
  No. 05-15275, 2007 WL2027359

7

Mabry v. Johnson (1970)                                      34
8  467 U.S. 504

9
Martin v. Marshall (N. D. Cal. 2006)                         27,28
  431 F.Supp.2d 1038

10

McQuillion v. Duncan (9th Cir. 2002)                         5,16
11  306 F.3d 895

12
Rosenkrantz v. Marshall (C.D.Cal. 2006)                      7,27,28
  444 F.Supp.2d 1063

13

RYMAN v. SEARS, ROEBUCK AND CO. (9th Cir. 2007)   7
14  505 F.3d 993, 994

15
Santebello v. New York (1971)                                34,45,46
  404 U.S. 257

16

Thompson v. Calderon (1996)                                  35
17  86 F.3d 1509

18
United States v. Anderson (9th Cir. 1992)                    44
  970 F.2d 602

19

U.S. v. Baksinian (C.D.Cal. 1999)                            35,38
20  65 F.Supp.2d 1104

21
U.S. v. Hallum (9th Cir. 1973)                               36,42
  472 F.2d 168

22

United States v. De La Fuente (9th Cir. 1993)   36,44,45
23  8 F.3d 1333

24
United States v. Floyd (9th Cir.  1993)                      44
  1 F.2d 867

25

United States v. Packwood (9th Cir. 1988)                    44
26  848 F.2d 1009

27
Weaver v. Graham (1981)                                      40
  450 U.S. 24; 67 L.Ed.2d 17; 101 S.Ct.  460

28

iv

1                       TABLE OF AUTHORITIES

2   AUTHORITY                                          PAGE

3   Williams v. Taylor (2000)                          2
      120 S.Ct. 1495
4
    Wolf v. McDonnell                                  40
5     418 U.S. 539; 41 L.Ed.2d 395; 94 S.Ct. 2693

6                       STATE CASE LAW

7   Bank of the West v. Superior Court                 36
      2 Cal.4th 1254
8
    Grubb v. Ranger Ins. Co. (1978)                    37
9     77 Cal.App.3d 526

10  In re Barker (2007)                                passim
      151 Cal.App.4th 346
11
    In re CLARENCE BURDAN (2008)                       26
12    208 Cal. App. LEXIS 385

13  In re Carabes                                      43
      144 Cal.App.3d 927; 143 Cal.Rptr.2d 65
14
    In re Dannenberg (2005)                            30
15    34 Cal.4th 1061

16  In re Dannenberg II (2007)                         6
      WL3408290
17
    In re DeLuna (2005)                                12
18    126 Cal.App.4th 585

19  In re Elkins (2006)                                6,7,27,28
      144 Cal.App.4th 475
20
    In re Jameison,                                    18,19
21    Santa Clara Superior Court Case No. 71194

22  In re Sandra Davis Lawrence (2007)                 passim
      150 Cal.App.4th 1511
23
    In re Lee (2006)                                   6,8,27,28
24    143 Cal.App.4th 1400

25  In re Morall (2002)                                5
      102 Cal.App.4th 280
26
    In re Ramirez (2001)                               4,14,18,26,30
27    94 Cal.App.4th 549
28

                                 v

## TABLE OF AUTHORITIES

AUTHORITY                                                    PAGE

In re Rosenkrantz (2002)                                     passim
  29 Cal.4th 616

In re Scott I (2004)                                         passim
  119 Cal.App.4th 871

In re Scott II (2005)                                        5-8
    133 Cal.App.4th 573

In re RONALD SINGLER (2008)                                  26
  2008 Cal. App. LEXIS 408

In re Smith I (2003)                                         5,12,26
  109 Cal.App.4th 489

In re Smith II (2003)                                        14,26
  114 Cal.App.4th 343

In re Tripp (2007)                                           8,16
  150 Cal.App.4th 306

In re Weider (2006)                                          27,28
  145 Cal.App.4th 570

People v. Cimarusti (1978)                                   34,41
  81 Cal.App.3d 314

People v. Collins (1978)                                     29,39,43
  21 Cal.3d 208

People v. Collins (1996)                                     39
  45 Cal.App.4th 849

People v. Orin (1975)                                        43
  13 Cal.3d 937

People v. Superior Court of Los Angeles County              41
  (Felman) (1976) 59 Cal.App. 270

People v. Rhoden (1999)                                      40
  75 Cal.App.4th 346

Southern Pacific Milling Co. v. Sillweck (1942)             37
  50 Cal.App.2d 72


        California Code of Regulations Title 15 Sections
                 Div 2 Board of Prison Terms

$2000                                                        14,43,45

**TABLE OF AUTHORITIES**

| AUTHORITY | PAGE |
|---|---|
| §2402(a) | 11 |
| §2402(c) | 6,26 |
| §2402(d) | 6,9 |

**Div 3 Department of Corrections**

| | |
|---|---|
| §3000 | 14,43 |

**California Penal Code**

| | |
|---|---|
| §187(a) | passim |
| §190.2 | 26,27 |
| §190.2(a)(14) | 25 |
| §190.4 | 27 |
| §1192.1 | 37,38,40 |
| §1192.2 | 40 |
| §1192.5 | 40 |
| §3041 | 4,18,38 |
| §3041(a) | 5,18 |
| §3041(b) | 5,7,18,21 |
| §3041.5 | 11,39 |

**California Civil Code**

| | |
|---|---|
| §1638 | 35 |
| §1644 | 35 |
| §1649 | 35 |
| §1654 | 36 |

**Other References**

| | |
|---|---|
| Black's Law Dictionary Abridged Sixth Edition | 6 |
| ABA Standards for Criminal Justice Prosecution and Defense Function, 3rd ED 1993 Rule 3-4-1(c) | 35 |

vii

1 Eric M. Lewis   E29675
PO Box 689      B-237L                **ORIGINAL**
2 Soledad, California 93960-0689
        In pro per

3

4

5

6

7                  UNITED STATES DISTRICT COURT

8

9               FOR THE NORTHERN DISTRICT

10

11  __ERIC M. LEWIS__          )       Case No.: _____
      PETITIONER,              )
12                             )       RE: MEMORANDUM OF POINTS AND
                               )       AUTHORITIES   IN   SUPPPORT
13    -V.-                      )       OF  PETITION  FOR  WRIT  OF
                               )       HABEAS CORPUS
14                             )
   __B. CURRY WARDEN, et al__   )
15    RESPONDENT               )
   _____ )

16

17

18

19

20

21

22

23

24

25

26

27

28

                              1

1    (PREFACE)

2    Amidst the myriad of United States Codes (hereinafter U.S.C.),

3    related to Federal Habeas Corpus, the most relevant burden of

4    proof that Petitioner bears is having to state a prima facie case

5    under 28 U.S.C. § 2254(d)(1) / § 2254(d)(2), as follows:

6    (d) "An application for a writ of habeas corpus on behalf
     of a person in custody pursuant to the judgement of a State
7    court shall not be granted with respect to any claim that was
     adjudicated on the merits in State court proceedings unless
8    the adjudication of the claim

9    (1) Resulted in a decision that was contrary to, or involved an
     unreasonable application of, clearly established Federal law,
10   as determined by the Supreme Court of the United States;

11   or

12   (2) Resulted in a decision that was based on an unreasonable
     determination of facts in light of the evidence presented in
13   state court proceedings."

14

15   28 U.S.C. § 2254(d)(1) has been adequately defined in **Williams**

16   **v. Taylor**, (2000) 120 S.Ct. 1495, 1519, 1520; 529 U.S. 362

17   holding:

18   "First, a state court decision is contrary to this Court's
     precedent if the state court arrives at a conclusion opposite
     to that reached by this Court on a question of law. Second,
19   a state court decision is also contrary to this Court's
     precedent if the state court confronts facts that are
20   materially indistinguishable from a relevant Supreme Court
     precedent and arrives at a result opposite to ours... A state
21   court decision will certainly be contrary to our clearly
     established precedent if the state court confronts a set of
22   facts that are materially indistinguishable from a decision
     of the Court and nevertheless arrives at a result different
23   from our precedent."

24   (UNREASONABLE APPLICATION)

25   "First, a state court decision involves an unreasonable
     application of this Court's precedent if the state court
26   identifies the correct governing legal rule from this Court's
     cases but unreasonably applies it to the facts of the particular
27   state prisoner's case. Second, a state court decision also
     involves an unreasonable application of this Court's precedent
28

2

if the state court either unreasonably extends a legal principle from our precedent to a new context where is should not apply or unreasonably extends a legal principle from our precedent to a new context where it should apply... [¶] A state court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case would qualify as a decision "involving an unreasonable application of... clearly established Federal law."

28 U.S.C. § 2254(d)(2)'s parameter is fairly analogous to U.S. Supreme Court holding of **Demosthenes v. Baal**, (1990) 110 S.Ct. 2223, 2225, which declared:

"A state court's determinations on the merits of a factual issue are entitled to a presumption of correctness on federal habeas corpus review. A federal court may not overturn such determination unless it concludes that they are not fairly supported by the record."

In arguendo, "not fairly supported by the record" appears to be parallel to "unreasonable determination of facts in light of the evidence presented". State court findings of fact are presumed to be correct unless rebutted by clear and convincing evidence. (28 U.S.C. § 2254(e)(1)).

Notwithstanding the **Williams v. Taylor**, supra, interpretation and holding of 28 U.S.C. §2254(d)(1)'s "unreasonable application" analysis, "clear error" is the doctrine that helps interpret this standard. The U.S. Supreme Court has stated in **Concrete Pipe & Prod. v. Const. Laborers Pen.**, (1983) 113 S.Ct. 2264, 2280: "Thus, review under the 'clearly erroneous standard' is significantly deferential requiring a definite and firm conviction that a mistake has been committed." **Anthony v. Cambra**, (9th Cir. 2000) 236 F.3d 568, 578, also assisted in clarification:

"In making this determination, this court first considers whether the state court erred at all; only after concluding that an error occurred does this court decide whether that error involved an unreasonable application of controlling law within the meaning of section 2254(d)."

3

1              **MEMORANDUM OF POINTS AND AUTHORITIES**

2                     **INTRODUCTION**

3     On February 27, 2007, the Board of Parole Hearings denied

4 Petitioner parole. Petitioner timely filed a Petition for Writ

5 of Habeas corpus in the Los Angeles County Superior Court

6 on OCT. 04, 2007 and denied on DEC. 21, 2007 in a reasoned

7 opinion. On Jan. 23, 2008 Petitioner timely filed a Petition

8 for Writ of Habeas Corpus in the Second Appellate District,

9 Case No. B205165, which was summarily denied on Mar 06, 2008.

10 On March 14, 2008, Petitioner timely filed a Petition for Review

11 in the California Supreme Court, Case No. S161806, which was

12 denied on May 14, 2008.

13 **Ground 1**

14     **PETITIONERS RIGHTS TO DUE PROCESS OF LAW UNDER SECTION
I, ARTICLE 15 OF THE CALIFORNIA CONSTITUTION AND THE**

15     **FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION WERE VIOLATED WHEN IN THE ABSENCE OF**

16     **EVIDENTIARY SUPPORT THAT PETITIONER IS 'CURRENTLY AN
UNREASONABLE RISK TO PUBLIC SAFETY' THE BOARD OF PAROLE**

17     **HEARINGS DECIDED THAT PETITIONER WAS UNSUITABLE FOR
PAROLE NW AND FOR THE NEXT THREE YEARS.**

18

19   On February 27, 2007, Petitioner was provided a Life Term

20 Parole Consideration Hearing before the Board of Parole Hearings

21 ("Board"). This hearing was Petitioner's Initial Parole

22 Suitability Hearing which was conducted seventeen (17) months

23 late.

24 **A. PURPOSE OF THE BOARD'S HEARING**

25   The purpose of the Board's Hearing was for the setting of

26 Petitioner's term uniformly to his offense and for a finding of

27 suitability for parole (See **Penal Code** (hereinafter "PC") **§3041.**

28 **5**; **In re Ramirez**, (2001) 94 Cal.App.4th 549, 570 (**Ramirez**);

                                   4

1  **McQuillion v. Duncan** (9th Cir. 2001) 306 F.3d 895 (**McQuillion**); **In**

2  **re Morall** (2002) 102 Cal.App.4th 280 (**Morall**); **In re Rosenkrantz**

3  (2002) 29 Cal.App.4th 660 (**Rosenkrantz**); **In re Smith** (2003)

4  109 Cal.App.4th 489 (**Smith**); and, **Biggs v., Terhune** (9th Cir.

5  2003) 334 F.3d 910 (**Biggs**).) "The overarching consideration in

6  determining whether to grant parole is 'public safety'. " (**In re**

7  **Barker** (2007) 151 Cal.App.4th 346 (**Barker**), relying on **In re Scott**

8  (2005) 133 Cal.App.4th 573, 591 (**Scott II**)). "Parole suitability

9  decisions for inmates serving indeterminate life terms are made,

10  in the first instance, by the Board." (**In re Scott**, (2004) 119

11  Cal.App.4th 871 (**Scott I**) at pp. 884-885)." The Board has broad

12  discretion, ...must normally set a parole release in a manner

13  that provides uniform terms for offenses of similar gravity and

14  magnitude with respect to the public safety." (Ibid; **PC §3041(a)**),

15  and must set a parole release date unless it determines that the

16  gravity of the current convicted offense or offenses, or their

17  timing and gravity, are such that public safety requires a more

18  lengthy period of incarceration (**Scott I**, supra, at p. 885; **PC**

19  **§3041(b)**).

20  **B. PAROLE BOARD DECISION IS ONE OF EQUITY AND DENIAL OF PAROLE**

21      **GRANT REQUIRES 'SOME EVIDENCE'**

22      The parole board's decision is one of equity' and requires
        careful balancing and assessment of the factors considered.

23      (**In re Sandra Davis Lawrence**, (2007) 150 Cal.App.4th 1511,
        1519 (**Lawrence**).)

24

25  "Equity" can be described as:

26      Justice administered according to fairness as contrasted with
        the strictly formulated rules of common law. It is based on a
        system of rules and principles which originated in England as

27      an alternative to the harsh rules of common law and which were
        based on what was fair in a particular situation. One sought

28      relief under this system in Courts of Equity rather than in

5

1    Courts of law. The term equity denotes the spirit and habit of
     fairness, justness, and right dealing which would regulate the
2    intercourse of men with men. Equity is a body of jurisprudence,
     or field of jurisdiction, differing in its origin, theory and
3    methods of common law; though procedurally, in the federal
     Courts and most state Courts equitable and legal rights and
4    remedies are administered in the same Court. (See **Black's Law**
     **Dictionary, Abridged Sixth Edition**, p. 374.)
5
**C. PAROLE BOARD'S EVALUATION CRITERIA**
6
7        The Board must evaluate specific factors in the course of their

decision making process.
8
9        The factors relevant to that determination are not spelled
         out in statutes enacted by the legislature but in regulations
10       promulgated by corrections administrators.  [**Lawrence**, supra
         at 1523.]
11
         Those regulations direct the Board's consideration to six non-
         exclusive circumstances tending to show unsuitability (**Title**
12       **15, Div. 2, §2402(c)**) and nine tending to show suitability
         (id., **§2402(d)**). (**Scott I**, supra, at pp. 888, 897.)" (**Barker**,
13       supra, at 351, citing **In re Elkins** (2006) 114 Cal.App.4th 475,
         487 (**Elkins**) fn. omitted.)
14
15        Based on numerous recent rulings in State and Federal courts

16   holding that in order to support a finding of unsuitability for

17   parole "some evidence bearing and indicia of reliability" must

18   exist that shows the prisoner is CURRENTLY an UNREASONABLE

19   risk of threat to public safety, and NOT "some evidence" of an

20   unsuitability factor, Petitioner submits that basing a denial

21   of parole on the unchanging factors of his crime rather than

22   his current risk of threat is a violation of due process. (See

23   **Hayward v. Marshall** (2008) 512 F.3d 536; **Irons v. Carey**, No.

24   05-15275, 2007 WL2027359, at *3 (9th Cir. July 13, 2007); **In re**

25   **Dannenberg**, No. H030031, 2007 WL3408290, at *9 (Cal.Ct.App. Nov.

26   16, 2007), modified, 2007 WL4227229 (Cal. [**DJDAR page 96**] Ct. App.

27   Dec. 3, 2007); **In re Lee**, 143 Cal. App. 4th 1400, 1408 (Cal. Ct.

28   App. 2006); **In re Scott II**, 133 Cal. App. 4th 573, 595 (Cal. Ct.

App. 2005); *see* Cal. Penal Code **§3041(b)** (providing that the Board "shall set a release date unless... consideration of the public safety requires a more lengthy period of incarceration for this individual"). For our purposes, then, "**[t]he test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety.**" **Lee**, 143 Cal. App. 4th at 1408 (citations and footnote omitted, Emphasis added); *see* also **In re Elkins**, 144 Cal. App. 4th 475,499 (Cal. Ct. App. 2006) (holding that the "governor, in reviewing a suitability determination, must remain focused... on facts indicating that release currently poses 'an unreasonable risk of danger to society' " (citing Cal. Code Regs. tit. 15, § 2402(a))); **Scott**, 133 Cal. App. 4th at 591 ("The factor statutorily required to be considered, and the overarching consideration, is 'public safety.'" (citing Cal. Penal Code §3041(b))). **Rosenkrantz v. Marshall**. 444 F.Supp.2d 1063,1080 n. 14 (C.D.Cal. 2006)

The following state appellate court cases are meaningful to this petition based upon the holding in **RYMAN v. SEARS, ROEBUCK AND CO.**, (9th Cir. 2007) 505 F.3d 993, 994.

> "[1] today we reiterate the rule that when (1) a federal court is required to apply state law, and (2) there is no relevant precedent from the state's highest court, but (3) there **is** [italics in original] relevant precedent from the state's intermediate appellate court, the federal court must follow the state intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it.' "

7

1   Recently, California Courts, specifically the First Appellate
2   District in **Barker** and the second Appellate District in **Lawrence**,
3   have further reviewed the Board's rules and procedures for
4   determining suitability which were examined and explained in **In**
5   **re Lee** (2006) 143 Cal.App, 4th 1500 (**Lee**), **Elkins**, **Scott I**, **Scott**
6   **II**, and **Rosenkrantz**. The Courts have, in each of these cases,
7   stressed the importance of "some evidence" to support a decision of
8   unsuitability. "Only a modicum of evidence is required to satisfy
9   the 'some evidence' standard." (**Rosenkrantz**, supra, at p. 667.)
10  However, that evidence "must have some indicia of reliability"
11  (**Scott I**, supra, at p. 889) and "suitability determinations must
12  have some rational basis in fact." (**Elkins**, supra, at p. 489.)

13      The evidence must sustain the ultimate conclusion that the
        prisoner's release currently poses an unreasonable risk of
14      danger to the public. It violates a prisoner's right to due
        process when the board or Governor attaches significance to
15      evidence that forewarns no danger to the public. (**In re Tripp**,
        (2007) 150 Cal.App.4th 306, 313)
16

17  **D. PETITIONER'S SUITABILITY FACTORS**

18      The Board's decision is not supported by <u>any</u> evidence whatsoever.
19  In its decision the Board commented on the following suitability
20  factors:

21      The previous record: Absolutely none; no record as a juvenile
        and no record as an adult.
22

23      There was no instability in your life that could be associated
        with the particular offense...

24      Institutional Behaviors: No 115s during your entire
        incarceration...
25

26      The parole plans, we did note that you do have viable parole
        plans both with transitional programs in the State of California
        and if it does prevail you also do  have parole plans in
27      Wisconsin. (Hearing Transcripts (HT) p. 3 84-85).

28

                                    8

1  The Board also commented early in the proceedings concerning

2  Petitioner's plans for housing:

3  ...and that you do have the Partnership for Re-Entry Program, which we're familiar with in Los Angeles. (HT p. 32 at 17)

4

5  and employment:

6  Then we also have another one from Playa Vista Job Opportunity and Business Services, again, a program that the Board is familiar with... the intent is to bring you into their program,

7  prepare and place you in a meaningful career track in employment in the construction trade should you be granted parole... and

8  the supportive resources that are available to you; that you have the necessary attributes, sincerity, drive, and past

9  performance and it would provide excellent assurance that you have the desire, motivation and ability to succeed. (HT p. 35

10  at 11.)

11  These statements provide more than 'some evidence' that

12  Petitioner not only has viable parole plans but also a <u>Board</u>

13  <u>recognized</u> support network available.

14  E. **PETITIONER'S SUITABILITY IN TERMS OF TITLE 15 DIVISION 2**

15  **§2402(d) CRITERIA**

16  Additionally, during the hearing Petitioner's appointed counsel

17  described how each of the nine factors tending to show suitability

18  applied to Petitioner.

19  ...Now going to the factors, the circumstances tending to show suitability, he does not have a juvenile record, no criminal

20  history. Stable social history and we should say that this is reasonably stable in that because he did have two prior

21  marriages, but he does maintain contact with his first wife, and he enjoys broad support from not only his nuclear family,

22  his sister is willing to help him, his mother, the extended family members including his cousin. He also -- You know the

23  counselor seems to predict bright things for him as well as -- And these are people that he's maintained relationships while

24  in custody. The Catholic Church, several members of the Catholic Church want to hire him and have worked with him over a long-

25  time. You know I think -- And one of them is a retired judge. And he's seen his share -- sent his share of men to prison

26  over the years, so I think we should lend that the credibility that it deserves and the fact that Mr. Lewis has more than

27  earned his keep. I mean he's done more than I've done on the outside during this time. While he's be in prison, he hasn't

28  been sitting around (inaudible) the prison; instead -- I mean

9

1   he's been using his expertise to help the system, to help the
    Board. He's been helping inmates. He's writing programs. I mean
2   he doesn't -- he's trying to better the very system that locks
    him up every night and that's very commendable. And that's
3   why when he went into custody in '89 -- in September of '89,
    on his institutional staff recommendation summary, it said he
4   appears to have led a very productive law-abiding life up to
    the time the crime occurred. Well guess what? Since the crime
5   occurred, that's continued. And that's very much true of his
    ability to maintain social ties in the face of being committed
6   too. His signs of remorse; he's written a letter to the Jordan
    family. He's also worked with members of the Catholic Church
7   that have written letters. He's talked about the time with his
    cousin, he wrote a letter on his behalf, and I think we don't
8   know him as well as they do, but there are people out there
    who recognize the fact that he has remorse for this crime.
9   Now as far as the motivation for the crime, at the time Mr.
    Lewis and Ms. Jordan had been planning a wedding for over six
10  months, which under the best circumstances is very stressful.
    They had also talked about job changes. There's information
11  that she was entertaining a job change from her family's
    business. And the job she was seeking, there's information
12  on the record that her job was going to have them separated,
    so at the time, he was under some stress factors that aren't
13  necessarily always present. His age reduces the probability
    of recidivism in that he's 51. Understanding and plans for
14  the future; he has very realistic plans for release including
    marketable skills. He has parole plans both in Los Angeles
15  and Wisconsin. He has people that are willing and who have the
    means and intention to financially support him, and these plans
16  have been verified by his counselor. He has marketable skills.
    He has marketable skills. He has marketable skills. What else
17  can you say about that? Institutional activities; you know I
    could talk about this for a couple of hours. I think that's
18  been well documented in this hearing. And also, you know there
    are so many things he's done since he's been in custody. I
19  think this crime would lend us, given all this convoluted
    information that was collected, to think, oh, you know, this
20  was he shot his wife in cold blood; you know he is a terrible
    person. But in the -- The stuff that he's done since he's been
21  in prison is unbelievable. I mean he's only (inaudible) He's
    given his time to the Catholic Church instead of planning you
22  know a big appeal or escape, he's helping the Catholic Church.
    He's working with other inmates. He's teaching other inmates
23  about communicable diseases, which is a huge community issue.
    He's really been an active community member within the prison
24  walls. He's worked tirelessly in the Veteran's Group, which he
    has a chrono -- has chronos for that. All those activities and
25  relationships have occurred since he's been committed really
    support pro-social characteristics. And all of what I just
26  explained and what's been brought here today weighs high in
    favor of suitability... (HT p. 73 L. 15 p. 77 L. 1).

27

28  The board accepted these statements without question or

10

1    objection.

2    **F. FAILURE OF BOARD TO EXAMINE PETITIONER'S CURRENT CHARACTER**

3       Petitioner submits that the Board fails to address the exact

4    nature of Petitioner's current character. By not doing so, the

5    Board violated the intent and spirit of **PC §3041.5** and **CCR**

6    **§2402(a)**, which demands that the board set a release date unless

7    Petitioner currently presents a risk of danger to the Public.

8    **G. PETITIONER'S PSYCHIATRIC ASSESSMENT**

9       Petitioner's Psychiatric Report, like those in **Barker** and

10   **Lawrence** is supportive of release. Deputy Commissioner Perez

11   reviewed the report and read its results into the record:

12       Let's take a look at the psych. The assessment -- excuse me.
    The diagnostic impressions indicate Axis I: No Mental Disorder.

13       Axis II: No personality Disorder. You have a current GAF score
    of 95. Assessment of dangerous indicates that in considering

14       potential for dangerous behavior in the institution, Mr.
    Lewis, you've remained entirely disciplinary free and this is

15       commendable. You live in an environment where anger, hostility,
    and confrontation occur on a regular basis. You're able to show

16       good judgement, self-control in avoiding problems because in
    addition there was no indication of violent behavior prior to

17       his commitment offense. Your potential for dangerous behavior
    at this point in your life is definitely below average in

18       comparison to other inmates and it says in considering potential
    for dangerous behavior in the institution, the factors noted

19       above also apply. In this writer's opinion, he does not pose
    any more risk to society than the average citizen in the

20       community. The psych recommendations indicate that there are no
    mental or emotional problems in this case that would interfere

21       with the routine parole planning. You would have outstanding
    vocational skills, and obtaining and maintaining employment

22       in the community will not be a problem. You have an extended
    family that has been offering financial help, residence, and

23       employment upon release, and **the prognosis for successful**
**adjustment in the community is in this case is excellent...**"

24       (HT p. 52 L. 2 – p. 53 L. 7) (Emphasis added)

25      Presiding Commissioner Garner, speaking for the Board in its

26   decision, accepted and summarized the report's findings saying,

27       The Psychological Report prepared by Dr. Macomber, May of
    2006, the report is favorable. (HT p. 85 at 1.)

28

1  This accepted report provides substantial 'forensic' evidence

2  via expert testimony, not just 'some evidence', that Petitioner

3  would not pose an "...unreasonable danger to public safety at the

4  present time... " (**Lawrence**, supra, 1530) and could "...live in

5  society without committing additional antisocial acts...." (**In re**

6  **Deluna** (2005) 126 Cal.App.4th 585, 591, quoting **In re Rosenkrantz**,

7  supra, 29 Cal.4th at page 655.)

8  **H. PETITIONER'S ACCEPTANCE OF RESPONSIBILITY AND REMORSE**

9  Petitioner accepted responsibility for the crime a number of

10  years ago. Petitioner's attorney stated:

11  He admitted this crime the same day that he was arrested,
   ...This was a crime of passion in that he murdered his fiancee..
12  (HT p. 71 L. 10-13)

13  and

14  However, you know in order to take responsibility, he stepped
   up to the plate early on and plead to first degree murder...
15  (HT p. 72 L. 27 - p. 73 L. 2).

16  In discussing Petitioner's remorse his attorney stated:

17  Signs of remorse: He's written a letter to the Jordan family.
   He's also worked with members of the Catholic Church that have
18  written letters. He's talked about the time that his cousin,
   he wrote a letter on his behalf, and I think we don't know
19  him as well as they do, but there are people out there where
   they have relationships with him recognize the fact that he
20  has remorse for this crime. (HT p. 75 L. 1-9)

21  The Board also commented on this noting letters of

22  support:

23  ...the first one I have is from our friend Sister Mary Hodges
   with (inaudible) Archdiocese of Los Angeles... And it speaks
24  to her knowing you for over four years, that you can't undo
   your past, and that you also have known the daily pains of
25  what occurred back in November 28th of 1988. During the four
   years she' known you, she's seen growth and growth in accepting
26  what can be changed in self-awareness and self-esteem,... (HT
   p. 33 at 10).

27

28  Petitioner also sent a letter to the Board accepting

12

1   responsibility and expressing remorse. "To deny the reason must

2   relate to the defendant's continued unreasonable risk to public

3   safety. So long as [the inmate] genuinely accepts responsibility

4   it does not matter how long-standing or recent it is..., (**Barker**,

5   supra, at 352 relying on **Lee**, supra, at 1405.)

6   **I. THE BOARD'S DECISION FAILED TO CONSIDER PETITIONER'S PLEA**

7     **BARGAIN**

8     Petitioner entered into a plea agreement with the Court.

9   During sentencing it was noted that Petitioner "...admitted this

10  crime the same day that he was arrested,... This was a crime of

11  passion..." (p. 71) that had no aggravating circumstances and

12  this fact was discussed in open Court as follows:

13  The Court: There are **no statements in aggravation** or mitigation

14           filed by the Defense. or the people. (Emphasis added)
             This was a plea?

15  Defense Counsel: Yes, your honor.

16  The Court: To a violation of 187, Murder, with the admission of

17           the use of a firearm for a term of 27 years to life.
             Correct?

18  Defense Counsel: Correct, your honor.

19  Prosecuting Attorney: Yes, your honor.

20    Additionally, at the start of the parole suitability hearing

21  Petitioner's attorney informed the Board of his plea agreement:

22      The case I'm relying upon is **Eyre v. Potter**, that is **E-Y-R-**

23      **E v. Potter**, 56 U.S. 42 at 43. This challenges consideration
        -- or this lays the standard of consideration. It recognizes
        the plea agreements are considered contracts and when the

24      People had a plea agreement with Mr. Lewis, they dismissed

25      other counts... and it is -- his part of the deal was okay,
        and we'll end the case right here, and I have -- I have the
        possibility of parole, meaning he's regularly supposed to be

26      found suitable under Title 15. And he was assured he would be
        the -- the minimum time would be possible based on what was

27      being used in the conviction. (p. 10-11)

28

13

**J. PETITIONER HAS PASSED HIS FIXED MINIMUM TERM.**

Petitioner's Minimum Eligible Parole Date (MEPD) was October 17, 2006. (See Exh. C, Calculation Worksheet.) The MEPD is codified in Administrative Law under California Code of Regulations, Title 15, Crime Prevention and Corrections ("Title 15" or "CCR"), Division 2, Board of Prison Terms, §2000 Rules of Construction and Definitions and Division 3, Department of Corrections, Chapter 1, Rules and Regulations of Adult Operations and Programs, §3000 Definitions, as "The earliest date on which an Indeterminate Sentencing Law or life prisoner may be legally released on parole."

The Court of Appeal in **In re Scott**, (2004) 119 Cal.App.4th 871 (**Scott I**), reaffirmed the rationale of the **Ramirez** and **Smith** Courts when it declared "...parole is the rule, rather than the exception... (**In re Smith**, (2003) 114 Cal.App.4th 343, 366 (**Smith**))".

The Second Appellate District, in the recently decided **Lawrence** case stated:

> When the legislature sets an Indeterminate maximum term with a fixed minimum term, the latter can be viewed as setting the period of imprisonment deemed necessary to satisfy the first two purposes [retribution and deterrence of future offenses by the offender and other potential offenders]... (**Lawrence at 1523**].

The **Lawrence** Court also added a footnote explaining:

> For purposes of parole the 'Fixed Minimum', is not necessarily the determinate term specified in the statute in effect at the time the Court sentenced the defendant... that minimum can be decreased by credits for time served and good conduct in prison... (**Lawrence fn. 55**).

**K. HEARING RESULTS**

The consequent result of this Board Hearing was an erroneous

14

1    and unlawful finding of unsuitability, based solely on the crime,

2    and a release date not set; Petitioner was given a three (3) year

3    denial (see Exh. F, Decision Worksheet).

4    **L. THE BOARD'S DECISION IS NOT SUPPORTED BY 'SOME EVIDENCE'**

5    The Court in **Biggs** held that the Board's continued use of the

6    crime as a basis for denial of parole violates both State and

7    Federal due process. The recent decision in **Irons v. Carey** (9th

8    Cir. 2007) 479 F.3d 658 (**Irons**), stated:

9    [5] We note that in all cases in which we held that a parole
10   board's decision to deem a prisoner unsuitable for parole
     solely on the basis of his commitment offense comports with
11   due process, the decision was made before the inmate had served
     the minimum number of years required by his sentence... All
12   we held in those cases and all we hold today, therefore, is
     that, given the particular circumstances of the offense in
13   these cases, due process was not violated when these prisoners
     were deemed unsuitable for parole prior to expiration of their
14   minimum term.

15   Petitioner submits, as described above, that he has served his

16   minimum term, which was passed on October 17, 2006. The Board's

17   failures to; uniformly measure his offense and set his term

18   proportionately to others similarly situated; not consider all

19   of the suitability factors discussed in the hearing; not consider

20   Petitioner's plea agreement; and, to find him unsuitable for

21   parole, violates both State and Federal due process. The Court

22   in **Irons** made it clear that no due process violation was present

23   if the prisoner has not "...served the minimum number of years

24   required by the sentence." In this case Petitioner has passed

25   that date (as described above) and submits that the Board's

26   denial of parole violated his due process rights under Article

27   I section 15 of the California Constitution and his Fifth and

28   Fourteenth Amendment rights under the United States Constitution

15

1    to not be deprived of his liberty and that not even a 'modicum

2    of evidence' (**In re Rosenkrantz,** supra, at 667) exists nor is

3    there 'some evidence' with "some indicia of reliability" (**Scott**

4    **I**, supra, at 889) that supports the Board's decision.

> The evidence must sustain the ultimate conclusion that the
> prisoner's release currently poses an unreasonable risk of
> danger to the public. It violates a prisoner's right to due
> process when the board or Governor attaches significance to
> evidence that forewarns no danger to the public. (**In re Tripp**,
> (2007) 150 Cal.App.4th 306, 313)

**GROUND 2**

**PETITIONER'S RIGHTS TO DUE PROCESS OF LAW UNDER SECTION I, ARTICLE 15 OF THE CALIFORNIA CONSTITUTION AND THE 5TH AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN, IN THE ABSENCE OF EVIDENTIARY SUPPORT, THE BOARD OF PAROLE HEARINGS DECIDED THAT PETITIONER WAS UNSUITABLE FOR PAROLE FOR THREE YEARS, DID NOT ENGAGE IN INDIVIDUALIZED DECISION MAKING, IMPLEMENTED AN UNWRITTEN POLICY OF PRESUMPTIVE DENIAL OF PAROLE FOR VIRTUALLY EVERY PRISONER WHO HAD BEEN GIVEN AN INDETERMINATE LIFE SENTENCE FOR MURDER.**

**A.    PETITIONER'S DENIAL OF PAROLE WAS BASED SOLELY ON THE COMMITMENT OFFENSE**

17    The current policy of the Board is the setting of a parole date

18    which is all too often the **exception** rather than the norm, and

19    thus violates the Petitioner's liberty interest that is present

20    in a parole date (**Rosenkrantz**, supra, at 660; **McQuillion**, supra,

21    at 895; **Biggs**, supra, at 910). At the Petitioner's Board Hearing,

22    the Board relied solely on the commitment offense to justify its

23    unlawful finding of unsuitability. During the Decision Phase the

24    Board stated:

> In a separate decision, the Hearing Panel finds that you've
> been convicted of murder and it's not reasonable to expect
> that parole would be granted during a hearing at - during the
> following three years. Our specific reasons for this finding
> are that the offense was carried out in an especially cruel
> manner. That you did plead guilty to the shooting death... that
> the offense was carried out in an especially callous manner

16

1   that demonstrates exceptionally callous disregard for human
2   suffering... the motive being in question... (HT p. 85-86.)

3   These are boiler plate recharacterizations of the offense by
4   the Board. These boiler plate statements are addressed in the
5   First Appellate Districts' recently decided **Barker** case.

6   8. The Board's 2005 decision... in regard to the commitment
    offense, the offense was carried out in an especially cruel
7   and callous manner... the offense was carried out in a manner
    which demonstrates an exceptional callous disregard for human
8   suffering... and the motive for the crime was inexplicable...
    (**Barker**, supra, at 352).
9

10  The Governor used similar boiler plate language in denying
11  **Lawrence's** 2004 parole grant.

12  The report stated the murder was a vicious crime committed
    for an incredibly petty reason and that was 'reason enough to
13  pose an unreasonable risk to public safety'. (**Lawrence**, supra
    at 1532.)
14

15  Again in 2005, the Governor, in denying **Lawrence's** 2005 parole
16  grant stated:

17  But as stated in my 2004 decision, the murder perpetrated by
    Ms. Lawrence demonstrated a shockingly vicious use of lethality
18  and an exceptionally callous disregard for human suffering...
    and the gravity alone of this murder is a sufficient basis on
19  which to conclude that Ms. Lawrence's release from prison would
    pose an unreasonable public safely risk." (**Lawrence**, supra at
20  1516.)

21
    These boiler plate statements prompted the second Appellate
22  District to comment in **Lawrence**
23
    ···and in the experience of this division in regularly reviewing
24  Parole Board and Gubernatorial denials of parole to murderers
    over the past few years, it is seldom either a Board or
25  Governor classifies a murder, first or second degree, as less
    than 'atrocious, heinous, or callous' or the equivalent. Indeed
26  they usually add a qualifier such as 'extremely' or 'vicious'
    to the description. [**Lawrence**, supra at 1533]
27

28  Petitioner requests the Court take Judicial Notice of **In re**

                                    17

1  **Jameison**, Superior Court of Santa Clara County, Case No. 71194

2  (Presented separately as Attachment I), wherein the Honorable

3  Linda Condron of the Santa Clara Superior Court wrote:

4  > Because it makes no effort to distinguish the applicability of
> the criteria between one case and another, the board is able to
5  > force every case of murder into one or more of the categories
> contained in § 2402(c). For example, if the inmate's actions
6  > result in instant death the board finds that it was done in a
> "dispassionate and calculated manner, such as execution-style
7  > murder." At the same time the board finds that a murder not
> resulting in near instant death shows a "callous disregard
8  > for human suffering" without further analysis or articulation
> of facts which justify that conclusion... If a gun was used
9  > the murder was performed in a "dispassionate and calculated
> manner, such as an execution-style murder." (p. 13)

10

11     The Board's eighteen year record of denying parole to well over

12  90% of appearing inmates is neither a constitutional application

13  of **PC §3041**, subsections (a) and (b), nor in conformity with

14  California Supreme Court's holding in **Rosenkrantz** that the

15  Board shall normally grant parole. It mathematically reflects a

16  systematic bias by the Board against granting parole.

17  **B. THE BOARD CANNOT RE-CHARACTERIZE THE COMMITMENT OFFENSE**

18     The Board cannot ignore the United States Supreme Court

19  mandates of **Blakely v. Washington** (2004) 124 S.Ct. 2531, 159

20  L.Ed.2d 403, and the recently decided **Cunningham** case (**Cunningham**

21  **v. California**, 127 S.Ct. 856 (2007)), and punish a prisoner by

22  redefining their offense as particularly egregious and including

23  crime elements which define it as one of a higher degree **not**

24  **found by a jury, or plead to by the defendant**, without violating

25  Petitioner's state and federal right to due process.

26  > "The Board may not recharacterize a plea based offense as one
> carrying a higher penalty. The Board must factor the discretion
27  > of the trial Court into its decision." (**Ramirez**, supra, fn.
> 8 at p. 569.)

28

1    Resolution of these issues by this Court is necessary to secure

2    uniformity of decision and to settle important questions of law.

3    This case also provides the Court with an opportunity to determine

4    if by denying parole to over 90% of eligible and appearing inmates

5    over the 18 years Petitioner has been incarcerated the Board

6    is normally granting parole as required in **Rosenkrantz**, supra,

7    at 673 and the California parole scheme, or does the Board's

8    repeated denial of parole during that period to well over 90% of

9    appearing inmates mathematically reflect their factual historical

10   bias against parole depriving appearing inmates of their state

11   and federally protected liberty interest. Please take Judicial

12   Notice of In re Jameison Superior Court of Santa Clara County

13   Case No. 71194 (Presented separately as Attachment I).

14   The **Lawrence** Court said:

15   [I]n those cases, as here, the board or governor labeled the
     murders in terms similar to the governor's "shockingly vicious
16   use of lethality" and "exceptional disregard for human suffering"
     description of Lawrence's commitment crime. Nonetheless, our
17   fellow state appellate Courts or federal Courts found crimes
     so described as inadequate to provide the sole or primary 'some
18   evidence' of present dangerousness some 15 to 20 years later,
     at least when in the meantime the prisoner had an exemplary
19   record in prison. (**Lawrence** at 1530-31.)

20   **C. PETITIONER'S POST CONVICTION RECORD**

21   The Board covered Petitioner's documented post conviction

22   record beginning at page 46 Line 27 and ending on page 55 Line

23   1 of the Hearing Transcript and included as Exhibits H through

24   M consisting of chronos, certificates, education and vocation

25   in Petitioner's State Petitions. These documents represent

26   petitioner's post-conviction history of positive programming.

27   Deputy Commissioner Perez recognized the volume of accomplishments

28   stating....

                                    19

1
2

> But I acknowledge that I only went  back to '98... (HT p. 53 L. 18-19)

3

and later stated:

4

> ...But I will tell you that this is very -- I'm very impressed with all that you've done... (HT p. 53 L. 24-26).

5
6
7

Petitioner's attorney also summarized his accomplishments stating:

8
9
10
11

> Mr. Lewis has more than earned his keep. I mean he's  done more than I've done on the outside during this time. While he's been in prison, he hasn't been sitting around (inaudible) the prison, instead -- I mean he's been using his expertise to help the system, to help the board. He's been helping inmates. He's been writing programs. I mean he doesn't -- he's trying to better the very system that locks him up every night and that's very commendable..." (HT p. 74 L. 10 -p.. 75 L. 19).

12
13
14

Presiding Commissioner Garner, during the Decision Phase of the hearing, also recognized Petitioner's positive programming:

15
16

> ...and I do want to put on the record that the conclusion of this panel had is three years is certainly going to be in recognition of the programming activities... (HT p. 86 L. 10-13.)

17

## D. INDIVIDUALIZED CONSIDERATION

18

In **Morall**, supra, at 280, the Court concluded:

19
20

> A refusal to consider the particular circumstances relevant to an inmate's individual suitability for parole would be contrary to law.

21
22
23

Moreover, the Court in **Biggs**, supra, addressed the Board's continued illegal use of the crime and/or prior history to justify denial of parole:

24
25
26

> ...a continued reliance... on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (**Biggs**, supra, at 917)

27
28

In Petitioner's case, he has no prior criminal history, the Board stated:

20

1   The previous record: Absolutely none; no record as a juvenile
2   and no record as an adult. (HT p. 4 L. 17-19).

3   Petitioner's attorney also stated:

4   ...in September of '89, on his institutional staff recommendation
    summary, it said he appears to have led a very productive
5   law-abiding life up to the time the crime occurred. (HT p.
    74 L. 20-24),

6   **E. PETITIONER HAS PASSED HIS FIXED MINIMUM RELEASE DATE**

7   Both **Biggs** and Petitioner are appealing the decision of their

8   initial suitability hearing. **Biggs** was different in that he had

9   not reached his MEPD and therefore, had not served the '...Fixed

10  Minimum Term...' explained in footnote 55 of the **Lawrence** case.

11  On the other hand the Petitioner in this case had passed his MEPD

12  some five months prior to his initial hearing and, a fortiori, had

13  served the '...Fixed Minimum Term...'

14  **F. THERE IS NO PUBLIC OPPOSITION TO PETITIONER'S RELEASE**

15  More importantly, there is no evidence that the public

16  required, or is seeking, a lengthier period of incarceration (**PC**

17  **§3041(b)**). There were no statements or letters in opposition to

18  a grant of parole. This is similar to **Lawrence** where the Court

19  noted:

20  [N]otably, no one spoke or wrote in opposition to a grant of
    parole, with the sole exception of a pro forma argument from
21  the district attorney... Not any other family member or friend
    of the victim. Not even, a representative of a 'victims rights'
22  organization. [**Lawrence** at 1515]

23  **G. THERE WERE NO AGGRAVATING FACTORS FILED BY PROSECUTION OR**

24      **FOUND BY THE COURT**

25  Also, during sentencing the Prosecuting Attorney admitted that

26  there were no mitigating or aggravating circumstances of the

27  offense. The dialogue from the proceedings are:

28  The Court: The Probation Department has submitted to this

21

1    Court a report consisting of some 14 pages, which I have read
     and considered.
2
     There are no statements in aggravation or mitigation filed by
3    the Defense or the People.

4    This was a plea

5    Defence Counsel: Yes, your honor.

6    The Court: To a violation of 187, Murder, with the admission of
     the use of a firearm for a term of 27 years to life. Correct?
7
     Defense Counsel: Correct, your honor.
8
     Prosecuting Attorney: Yes, your honor."
9

10   **H. PETITIONER'S CIRCUMSTANCES OF THE OFFENSE ARE NO MORE THAN**

11       **NECESSARY TO SUSTAIN A CONVICTION**

12   This is similar to that discussed in **Barker**, supra, at 356:

13   As we recently elaborated on this concept in Elkins, it
     violates due process to deny parole "where no circumstances
14   of the offense reasonably could be considered more aggravated
     or violent than the minimum necessary to sustain a conviction
15   for that offense." (**Elkins**, supra, at p. 497.)

16   In Petitioner's case the Prosecuting Attorney also admitted

17   that:

18   He, [Petitioner] was allowed to pled guilty to first degree
     murder... based on the problems of proof.
19
     which is why there was
20
     ...only the minimum necessary to sustain a conviction...
21   (**Elkins**, supra, at p. 497)

22   The **Lawrence** Court, citing **Rosenkrantz** stated:

23   The California Supreme Court has clarified California's 'some
     evidence' test in this respect, however, to be used as the
24   primary basis of a denial of parole, a commitment offense must
     be more than the minimum elements of that crime. [Citation]
25   Not every first degree murder can be found 'atrocious, heinous,
     or callous' or the equivalent without doing violence to the
26   Supreme Court's articulation of the 'some evidence' test"
     [**Lawrence** at 1530)
27

28   Petitioner submits that the Board's denial of a parole date

                                22

1  was not based on 'some evidence' and is a continuation of its

2  unwritten no parole policy.

3  GROUND 3

4      **PETITIONER'S RIGHTS TO DUE PROCESS OF LAW UNDER ARTICLE
        I, SECTION 15 OF THE CALIFORNIA CONSTITUTION AND THE**

5      **FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
        CONSTITUTION WERE VIOLATED WHEN THE BOARD IN THE ABSENCE**

6      **OF 'SOME EVIDENCE BEARING AN INDICIA OF RELIABILITY',
        RE-CHARACTERIZED THE CRIME AND DENIED HIM PAROLE FOR**

7      **THREE YEARS.**

8   Petitioner was denied a parole release date because:

9   ...the offense was carried out in an especially cruel manner.
    That you did plead guilty to the shooting death... and ...the

10  offense was carried out in an especially callous manner that
    demonstrates an exceptionally callous disregard for human

11  suffering... associated with the magnitude of the injuries
    that the victim sustained. (HT, p. 85.)

12

13  This is a re-characterization of the commitment offense by the

14  Board and is not supported by 'some evidence'. This finding must

15  be evaluated in terms of the 'some evidence' test as described by

16  the Second Appellate District, Division 7, in **Lawrence**:

17  Not every first degree murder can be found to be atrocious,
    heinous, or callous' or the equivalent without doing violence

18  to the [California] supreme Court's articulation of the 'some
    evidence' test." [**Lawrence**, supra, at 1530)

19

20  A. **PETITIONER'S CASE WAS SETTLED VIA PLEA AGREEMENT**

21  Petitioner's case was settled via plea agreement which was

22  recognized by the Board "...that you plead guilty to the shooting

23  death..." (HT p. 85). The facts of the offense were presented to

24  the sentencing Court and agreed upon by the Prosecuting Attorney,

25  Defense and the Court. In fact, the Court stated that neither the

26  Prosecuting Attorney nor Defense submitted motions in mitigation

27  or aggravation. The dialogue went:

28  The Court: There are no statements in aggravation or mitigation

                            23

1    filed by the Defense or the people.

2    This Was a plea?

3    Defense Counsel: Yes, your honor.

4    The Court: To a violation of 187, murder with the admission of
     the use of a firearm for a term of 27 years to life.

5
     Correct?
6
     Defense Counsel: Correct, your honor.
7
     Prosecuting Attorney: Yes your honor."
8

9    The prosecuting attorney also stated, later in the same

10   proceedings:

11   He [petitioner] was allowed to plead guilty to first degree
     murder based on the problems of proof
12

13   **B. THE BOARD'S ACCEPTED FACTS OF THE OFFENSE**

14   The Board also noted the synopsis of the crime as provided in

15   the Elements and Relevant Circumstances of the Offense of the

16   Probation Officer's Report (POR) (See Exh. G, Probation Officer's

17   Report.) Presiding Commissioner Garner stated:

18   In that this is an initial hearing, what we're encouraged to
     do is use either the probation officer's report or an appellate
19   record as to a summary of the offense. In this particular case,
     there is no appellate record, so what we will do is use the
20   probation officer's report to provide a summary of the commitment
     offense... (HT p. 16 L. 19-26).
21

22   Presiding Commissioner Garner then read the following from the

23   POR:

24   On November 29, 1988, between 10 A.M. and 10:30 A.M., defendant
     shot the victim Beverly Jean Jorden to death with a .45 caliber
25   handgun. The defendant and victim were engaged to be married
     and lived together in an apartment in Woodland Hills. On the
26   morning of the murder, the defendant and victim in separate
     vehicles went to the location on Santa Susanna Pass Road.
27   Investigation at the crime scene concluded that due to the
     condition and position of the victim's body and her vehicle,
28   the victim knew her assailant and allowed him to enter her

                                   24

vehicle before she was shot. She was shot four times with a .45 caliber handgun. She was discovered slumped at the wheel of her vehicle by passing bicyclists who notified police. Victim dies of multiple gunshot wounds -- three in the head and one in the arm. Follow-up investigation by detectives led to the defendant. He admitted to killing the victim but not because of money but because he got angry. One month prior to the death of the victim, she got a life insurance policy for $150,000 with the defendant as beneficiary. (HT p. 17-18.)

The Board accepted these facts and thus established the circumstances of the commitment offense.

**C. THE EVIDENCE SUPPORTS ONLY THE MINIMUM ELEMENTS FOR CONVICTION**

The evidence in this case was insufficient to find anything other than the petitioner killed his victim, which he confessed to on the day of the murder. Also, it does not reflect a person intent on torturing or otherwise causing unusual suffering to that victim and is consistent with the type of physical evidence of the four gunshot wounds.

**D. PETITIONER WAS UNDER STRESS AT THE TIME OF THE MURDER**

Petitioner admitted to the murder "...because he got angry..." (Exh. G, POR p. 2 L. 26) which was caused by stress explained by his attorney during the hearing.

At the time Mr. Lewis and Ms. Jordan had been planning a wedding for over six months, which under the best circumstances is very stressful. They had also talked about job changes. There's information that she was entertaining a job change from her family's business and the job she was seeking, there's information on the record that her job was going to have them separated. So at the time, he was under some stress factors that aren't always present. (Exh. 'A, HT p. 74.)

**E. THE BOARD'S FINDINGS ARE INCONSISTENT WITH THE EVIDENCE**

According to the elements of the crime agreed upon nothing suggests that the wounds were inflicted to cause Ms. Jordan more pain than required to kill her.

25

1    ...the Board may not recharacterize a plea offense as one
2    carrying a higher penalty. The board must factor the discretion
     of the trial Court into its decision. (**Ramirez**, fn. 8 at p.
3    569.)

4    If the Board's findings that 1) ...the offense was carried
5    out in an especially cruel manner... and 2) ...the offense was
6    carried out in an especially callous manner that demonstrates
7    an exceptionally callous disregard for human suffering...
8    associated with the magnitude of the injuries that the victim
9    sustained... suggests that Petitioner inflicted more suffering
10   than needed to commit the murder, the finding is inconsistent with
11   the evidence. Once again, any additional suffering accompanying
12   the four bullet wounds was not intended but rather the product
13   of Lewis' fury and his ineptitude at the crime of murder - hardly
14   a reason for labeling him an "especially callous" murderer with
15   "an exceptionally callous disregard for human suffering."

16   Recent rulings from the third appellate district ruling in **In
17   re CLARENCE BURDAN** 2008 Cal. App. LEXIS 385, and **In re RONALD
18   SINGLER**, 2008 Cal. App. LEXIS 408, two cases with similar
19   circumstances to Petitioner's, have held that the circumstances
20   of the crime, although egregious, are NOT sufficient to meet the
21   "some evidence" requirements necessary to deny parole.

22   **F. THE BOARD'S RECHARACTERIZATIONS OF THE CRIME ARE THOSE USED
23   TO DEFINE 'SPECIAL CIRCUMSTANCES' IN PC §190.2**

24   Petitioner's plea and conviction were under **PC §187(a)**. The
25   Boards adjectives used in re-characterizing Petitioner's offense
26   are provided in CCR Title 15, Division 2 **§2402(c)**. These reasons
27   are based on language used to describe the categories for Special
28   circumstances described in **PC §190.2**. More specifically, the

26

1    reasons used by the Board for Petitioner's denial can be found in

2    **PC §190.2(a)(14)**. **PC §190.2** is the section titled <u>Death Penalty</u>

3    <u>or life imprisonment without parole special circumstances</u> and

4    states:

5      (a) The penalty for a defendant who is found guilty of murder
     in the first degree is death or imprisonment in the state prison

6    for life without the possibility of parole if one or more
     of the following special circumstances has been found under

7    section 190.4 to be true:

8      (14) The murder was especially heinous, atrocious, or cruel,
     manifesting exceptional depravity. As used in this section, the

9    phrase "especially heinous, atrocious, or cruel, manifesting
     exceptional depravity" means a conscienceless or pitiless crime

10   that is unnecessarily torturous to the victim." (PC §190.2)

11       The use of these statements is not supported by 'some

12   evidence' nor were they found by a jury or trier of fact as

13   specified under **PC §190.4**.

14       Petitioner's situation is similar to **Lawrence** when the Second

15   Appellate District stated:

16     ...it is difficult to find Lawrence's commitment crime supplies
     'some evidence' rationally demonstrating she represents an

17   unreasonable danger to the public safety at the present time.
     That is, how can it be said her crime is more predictive of

18   future dangerousness than the murders found insufficient for
     that purpose by our fellow appellate Courts in **In re Smith**,

19   **In re Scott**, **In re Lee**, **In re Weider**, and **In re Elkins**, nor
     by the federal district Courts in the published decisions,

20   **Rosenkrantz v. Marshall** and **Martin v. Marshall**... (**Lawrence**,
     supra at 1531, fn. omitted]

21

     G. **SECOND APPELLATE DISTRICTS REVIEW OF SIMILAR CASES AND SOME**

22      **EVIDENCE**

23       The court in **Lawrence** opined:

24   In those cases, as here, the Board or the Governor labeled the
     murders in terms similar to the Governor's "shockingly callous

25   disregard for human suffering" description of Lawrence's
     commitment crime. Nonetheless, our fellow state appellate

26   Courts or federal Courts found crimes so described as inadequate
     to provide the sole or primary "some evidence" of present

27   dangerousness some 15 to 20 years later, at least when in the
     meantime the prisoner had an exemplary record in prison.

28

1   And what of those crimes?

2   In **In re Smith**, the prisoner, a drug dealer, was convicted for
    his role in the shooting, beating, and drowning of another drug
3   dealer some 15 years before the grant of parole the Governor
    had reversed. (Citation]
4
    In **In re Scott**, a wayward wife told her husband she was leaving
5   her lover and returning to the husband, but then didn't show
    up. In a rage, the husband drove over to the lover's house and
6   shot him in the head with a rifle. [Citation]

7   In **In re Lee**, a man seeking to collect on a business debt
    brought a gun and a box of bullets along to a meeting and
8   when refused a payment fired five shots, wounding the debtor but
    killing the debtors wife. [Citation]
9   In **In re Weider**, another distraught husband took a gun into
    a public restaurant and fired twice at the man who had been
10  living with his estranged wife for two years but missed, then
    threatened to kill himself and in the ensuing fracas managed to
11  kill not only the other man, but wound two innocent restaurant
    patrons, one of them fatally. [Citation)
12
    In **In re Elkins**, in order to rob a sleeping friend he owed
13  money for drugs, a 19 - year old addict who was on probation
    for another offense struck the victim with a baseball bat then
14  pummeled him to death with that bat, drove the body into the
    wilderness and dumped it down a remote embankment, stole more
15  of the victim's belongings from a storage locker, and fled the
    state. [Citation]
16
    In **Rosenkrantz v. Marshall**, a young man provoked by being
17  "outed" by his brother and a friend acquired an automatic
    weapon, planned and even rehearsed the shooting for a week
18  before blasting his victim with a fusillade from the gun.
    [Citation]
19
    In **Martin v. Marshall**, drug user shot his drug dealer whom he
20  owed money, and two other innocent restaurant patrons, killing
    both the dealer and one of the patrons, [citation]
21
    All of the above murders involved at least as "shockingly
22  vicious use of lethality" and "exceptionally callous disregard
    for human suffering" as did **Lawrence's** murder of her paramour's
23  wife. Several resulted in the killing or wounding of multiple
    victims. Several had economic as opposed to emotional motives,
24  and several prisoners were involved in other criminal activities
    at the time of the offense. Yet state appellate courts or
25  federal courts found these earlier commitment offenses failed
    to provide "some evidence" of the perpetrator's present
26  dangerousness if released to the outside world. (**Lawrence**, at
    1531-32)
27
28  Applying the **Lawrence** Court's comparative analysis to the

                                    28

1  instant case indicates Petitioner's offense fails to supply 'some
2  evidence' of his present dangerousness if released on parole.
3  **H. SOME EVIDENCE STANDARD IS INAPPROPRIATE FOR PLEA CONVICTION**
4      A plea contract resulting in a defendant being indeterminately
5  sentenced is executed in multiple stages. Following the parties
6  agreement, the plea's express term's and consequences are specified
7  before the Court, and the People may stipulate the offense for
8  which the defendant is being convicted and punished. During
9  the next stage the defendant is sentenced, providing the state
10 it's mutual benefit in the form of his uncontested imprisonment.
11 Once the defendant serves the uniform term specified by statute
12 and regulation for the gravity, circumstances and degree of the
13 stipulated offense, the state must timely provide the defendant
14 with his reciprocal benefit, his critically owed lessened punishment
15 for the agreed upon offense type and degree. (**People v. Collins**,
16 (1978), 21 Ca.3d 208, 214-215.) Should the State executive fail
17 to provide the defendant with his reciprocal benefit, the Court,
18 as a party to the agreement and stipulation, must act to ensure
19 the defendant receives his bargained for consideration. This is
20 not a 'some evidence' question, it is instead a contract dispute
21 settled under California contract law. As a party is bound by the
22 plea contract it approved, this Court now has the responsibility
23 to enforce its terms by providing Petitioner his owed contractual
24 benefits.
25     At this point in time, after nearly 19 years after entering
26 his plea, denial based solely on the factors of the offense has
27 been found to be unlawful by the California Supreme Court in
28 the cases of **Rosenkrantz** and **Dannenberg** if crime factors are not

29

1  found to be "particularly egregious" (**Rosenkrantz**, at 683 quoting

2  **Ramirez**, supra, at 570) which means "more than the minimum

3  necessary to sustain the conviction" (**In re Dannenberg** (2005) 34

4  Cal.4th 1061 at 1067 (**Dannenberg**). However, both of these cases

5  arose out of jury trials where the 'some evidence' standard used

6  by the Board was found to be less than the 'reasonable doubt'

7  standard to which juries are held. Consequently, this standard

8  is opposite that held applicable for convictions as a result of

9  plea agreements which require a more lenient disposition.

10  Therefore, Petitioner's due process rights of law under

11  Article I, Section 15 of the California Constitution and the

12  Fifth and Fourteenth Amendments of the United States Constitution

13  were violated when his commitment offense which did not

14  "...involve more than the minimum elements necessary to sustain a

15  conviction..." [**Rosenkrantz**, supra, 29 Cal.4th at 683] and should

16  not have been re-characterized by the Board as "...especially

17  cruel...", "...especially callous...", and "...demonstrates an

18  exceptionally callous disregard for human suffering."

19  **Ground Four**

20  **PETITIONER'S RIGHTS TO DUE PROCESS OF LAW UNDER SECTION 1, ARTICLE 15 OF THE CALIFORNIA CONSTITUTION AND THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN THE BOARD DENIED HIM PAROLE FOR THREE YEARS STATING "...THE MOTIVE BEING IN QUESTION..."**

21

22

23

24  Petitioner was denied a parole release date because "...the

25  motive being in question." (HT p. 86 L. 21-2.) Earlier in the

26  hearing the Board also noted the synopsis of the crime as provided

27  in the Elements and Relevant Circumstances of the Offense of the

28  Probation Officer's Report (POR). Presiding Commissioner Garner

1  stated:

2     In that this is an initial hearing, what we're encouraged to
      do is use either the probation officer's report or an appellate
3     record as to a summary of the offense. In this particular
      case, there is no appellate record, so what we will do is
4     use the probation officer's report to provide a summary of the
      commitment offense... (HT p. 16 L. 19-26).

5

6  **A. THE BOARD'S ACCEPTANCE OF THE CIRCUMSTANCES OF THE OFFENSE**

7     Presiding Commissioner Garner read the POR into the record

8  (Please see HT p. 17-18). Neither Board member present at the

9  hearing questioned these facts and accepted them as true.

10    Presiding Commissioner Garner then began a discussion with

11 Petitioner concerning the commitment offense. This dialogue is

12 found on pages 18 through 28 of the Hearing Transcripts.

13    During the discussion Petitioner discussed the argument he and

14 Ms. Jordan were having prior to the murder:

15    ...where this condo complex was, we were discussing the way and
      this is where we started arguing. And the argument was of all
16    things about what I was going to wear at the wedding and some
      other wedding details. But it was basically we were arguing
17    over that. And we argued in my vehicle, and she got out and
      went into hers. And then I went back with her and that's when
18    I brought the gun with me. And the reason I was doing that
      was because she was going on a job interview in Los Angeles,
19    and she was going to a part of LA that was not exactly safe
      in my eyes. And we had discussed this the night before when
20    she had told me about the job interview. And I encouraged her
      to take the gun if for no other reason just to -- for show...
21    (HT p. 26 L. 9-11.)

22 **B. FACTORS CONTRIBUTING TO THE COMMITMENT OFFENSE**

23    Later in the hearing Petitioner's attorney discussed other

24 factors contributing to the murder:

25    ...Now as far as the motivation for the crime, at the time Mr.
      Lewis and Ms. Jordan had been planning a wedding for over six
26    months, which under the best circumstances is very stressful.
      They had also talked about job changes. There's information
27    that she was entertaining a job change from her family's
      business. And the job she was seeking, there's information
28    on the record that her job was going to have them separated,

                                  31

1    so at the time, he was under some stress factors that are not
     necessarily always present... (HT p. 75 L. 9-20)
2

3    This reveals the stress that Petitioner was under and is one

4   of the suitability factors. These factors do not lessen the

5   severity of the crime but only reveal factors that ultimately

6   led to its conclusion. Petitioner has accepted responsibility

7   and has shown remorse

8    I will never forgive myself... I relive that day probably every
     day of my life now and it was wrong." (HT p. 26)
9

10  and later:

11   In terms of suitability, I've worked hard while I've 'been in
     here to accept responsibility for the crime. That was-- that
     being tantamount to being found suitable. If you can't accept
12   responsibility and you didn't know what you did was wrong,
     then how can you possibly be a law-abiding citizen when you
13   get out... I took a life. I took her away from her family
     and I will forever have that on my mind, and it is on my mind
14   every day. (HT, p. 80-83)

15  **C. BOARD DECISION**

16   Presiding Commissioner Garner, reading the Board's denial,

17  stated:

18   The motive for the crime we have two categories; one is it's
     certainly inexplicable, and the other option is that if it
19   truly was as a result of a dispute over the attire for your
     pending wedding, that would tend to make it very trivial in
20   nature. (HT p. 84 L. 7-13.)

21   The Board never decided on the motive stating only "...the

22  motive being in question..." (HT P. 86 L. 22) which is similar

23  to that used in **Barker** prompting the **Barker** Court to state:

24   ...regarding the Board's statement 'the motive for the crime
     was inexplicable or very trivial,' as we observed in **Scott I**,
25   'The Board did not indicate whether it found [**Barker's**] motive
     'inexplicable' or 'very trivial in relationship to the offense,'
26   as it could not be both." (**Scott I**, supra, 119 Cal.App.4th at
     p. 892.) "An 'inexplicable' motive, as we understand it, is one
27   that is unexplained or unintelligible, as where the commitment
     offense does not appear to be related to the conduct of the
28   victim[s] and has no discernible purpose. A person whose motive

32

1    for a criminal act cannot be explained or is unintelligible
     is therefore unusually unpredictable and dangerous. (Id. at
2    p. 893.) **Barker**'s motive was not "inexplicable" under this
     definition. (**Barker**, at 356-357)
3

4    In Petitioner's case the motivating factors were stress from

5    Ms. Jordan's job change, their separation due to that change,

6    planning for their wedding and honeymoon and the added stress

7    brought on with the final preparations for their wedding, which

8    was only 10 weeks away. As stated by the **Lawrence** Court:

9    [I]mportant... in assessing any due process violation is the
     fact that continuous reliance on unchanging circumstances
10   transforms an offense for which California law provides
     eligibility for parole into a de facto life imprisonment
11   without the possibility of parole. The Court asks rhetorically
     what is it about the circumstances of petitioner's crime or
12   motivation which are going to change? The answer is nothing.
     The circumstances of the crime will always be what they were,
13   and petitioner's motive for committing them will always be
     trivial... Given that no one seriously contends lack of
14   seriousness or lack of triviality at the present time, the
     potential for parole in this case is remote to the point of
15   nonexistence. Petitioner's liberty interest should not be
     determined by such an arbitrary remote possibility. (**Lawrence**,
16   fn 44)

17   **D. PROSECUTION'S FAILURE TO STIPULATE AT SENTENCING**

18   During plea negotiations the prosecution was aware of and

19   considered the motivating factors in crafting the agreement.

20   Had the motive been truly 'trivial' or 'unknowing' then the

21   prosecution would have been remiss in not stipulating them at

22   sentencing.

23   Therefore, based on the foregoing, the motivation for the crime

24   is not "...in question.." as stated by the Board. Petitioner

25   should have been found suitable and released on parole at his MEPD

26   in accordance with the plea agreement. Similarly petitioner's

27   motive is neither 'inexplicable' nor trivial.

28

33

**Ground Five**

> **PETITIONER WAS DENIED HIS CONSTITUTIONALLY PROTECTED RIGHT OF DUE PROCESS BY THE STATE AND BOARD OF PAROLE HEARINGS FAILURE TO RESPECT THE TERMS OF HIS NEGOTIATED PLEA AGREEMENT WHICH ARE SETTLED ACCORDING TO CONTRACT PRINCIPLES OF COMMON LAW AND DUE PROCESS.**

**A. INTRODUCTION**

The United States Supreme Court has found that a guilty plea is only valid under the United States Constitution if it is a voluntary, knowing and intelligent act. (**Santebello v. New York** (1971) 404 U.S. 257, 261 (**Santebello**); **Mabry v. Johnson** (1970) 407 U.S. 504, 508 (**Mabry**); **Brady v. United States** (1970) 397 U.S. 742, 748 (**Brady**). This includes the requirement that the defendant be aware of the direct consequences of his plea and the value of his plea bargain. For a plea to meet the constitutional standard of voluntariness it must be "Entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the Court, Prosecutor or his counsel..." (**Brady**, supra, at 755, **Mabry**, supra, at 509). This is clearly established federal law, as determined by the Supreme Court of the United States." (28 U.S.C. § 2254(d)(1)).

**B. PLEA AGREEMENT PARTIES FUNCTIONS AND RESPONSIBILITIES**

The parties involved in a plea agreement each have a specific function and responsibility. The function of the defendant (promisee), is to obtain the most beneficial deal in terms of reduced punishment based on the offense's range of punishment.

The function of the District Attorney (promisor), as explained by the California Courts which held in **People v. Cimarusti** (1978) 81 Cal.App.3d 314, 323:

[I]t is the function of the executive branch to engage in

34

negotiation with the defense by which a lenient disposition of the charge made is secured without trial.

The District Attorney represents and binds the government to the terms agreed upon:

> In criminal prosecution, prosecutor represents the state. (**Thompson v. Calderon** (1996) 86 F.3d 1509.)
>
> The Prosecutor's Office is an entity and as such it is the spokesman for the government. (**Giglio v. U.S.** (1972) 405 U.S. 150, 154.) Government prosecutors have the power to bind the sovereign. A prosecutor who reaches a plea agreement binds the government to that agreement. (**U.S. v. Baksinian** (C.D.Cal. 1999) 65 F.Supp.2d 1104, 1106.)

The District Attorney is also "A minister of Justice... The District Attorney is ethically bound not to make false statements or misrepresentations in the course of plea discussions..." (ABA Standards for Criminal Justice, Prosecution Function and Defense Function, 3rd Ed, 1993), Rule 3-4-1(c)). Therefore, the District Attorney is a "...spokesman for the government..." and is "...ethically bound..." to ensure that all terms of a plea agreement are understood by the defendant.

## C. PLEA AGREEMENTS ARE GOVERNED BY CONTRACT LAW

In California, "Courts are required to construe and interpret plea agreements in accordance with state contract Law;" (**Buckley v. Terhune** (2006 9th Cir) 444 F.3d 688, 695.) California has a three step process for interpreting contracts. First, a court must look to the plain meaning of the agreement's language. (**Cal. Civil Code §1638, §1644**.) Second, if the language in the contract is ambiguous, "it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (**Cal. Civil Code §1649**.) The inquiry considers not the subjective belief of the promisor but, rather the

35

1  "objectively reasonable expectations" of the promisee. (**Bank of**
2  **the West v., Superior Court**, 2 Cal.4th 1254, 1265.) Petitioner's
3  "objectively reasonable expectations" were to be released on
4  parole at his MEPD. Petitioner understood that his release on
5  parole would be based on his fulfillment of reasonably understood,
6  and unstated, requirements, which have been meet as supported by
7  the evidence in this case and noted by the Board and discussed
8  previously in this writ. (Please see HT p. 46-55.)

9     Finally, if after this second inquiry the ambiguity remains,
10 "the language of a contract should be interpreted most strongly
11 against the party who caused the uncertainty to exist." (**Cal.**
12 **Civil Code §1654**.) "Focusing on the defendant's reasonable
13 understanding also reflects the proper constitutional focus on
14 what induced the defendant to plead guilty." (**Brown v. Poole**
15 (2003 9th Cir.) 337 F.3d 1155, 1160 quoting **United States v. De**
16 **La Fuente**, (1993 9th Cir) 8 F.3d 1333, 1337.)

17     Whether the prosecutor actively misled the petitioner, or
18 more likely, simply knowingly allowed petitioner to proceed on
   the basis of misapprehension regarding the sentence he would
19 receive, the prosecution must fulfill petitioner's reasonable
   understanding of the plea agreement. (**U.S. v. Hallum**, (9th
20 Cir. (1973) 472 F.2d 168, 169)

21    Additionally, there was no mention or explanation that
22 Petitioner's release on parole would be subject to Board and
23 Gubernatorial review, after service of the contract. This is,
24 in effect, a renegotiation of the plea agreement after the fact
25 and is barred by contract law. Once it has been established that
26 Petitioner has fulfilled his end of the bargain, as the evidence
27 in this case supports, no further review is required, much less
28 permitted, by contract law.

                                    36

**D. IMPLIED TERMS OF PLEA CONTRACTS**

1   California contract law also requires consideration be given
2   the implied terms - the law underlying the agreement, specifically
3   noting, "All things that in law or usage are considered as
4   incidental to a contract, as necessary to carry it into effect are
5   implied there from, unless some of them are expressly mentioned
6   therein, when all other things of the same class are determined
7   to be excluded." (**Cal. Civil Code § 1156.**) Elaborating on this
8   standard, **Grubb v. Ranger Ins. Co.** (1978) 77 Cal.App.3d 526,
9   holds that under California law all applicable laws in existence
10  when an agreement is made necessarily enter such contract and
11  form part of it, without any stipulation to that effect as if
12  they were expressly referred to and incorporated into its terms.
13  Such principle is held to embrace a state's statutes. Also see
14  **Southern Pacific Milling Co. v. Sillweck** (1942) 50 Cal.App.2d 79,
15  holding that as regards to contracts:

    ...it is a well-settled principle that which is implied by law
    becomes part of that contract as that which is therein written,
    and if the contract is clear and complete, when aided by that
    which is imported into it by legal implications, it cannot be
    contradicted by parol in respect of that which is implied any
    more than in respect of that which is written.

    Not only are all applicable law and statutes expressly
contained in the plea agreement but also all government entities
(i.e., agencies) are bound by the plea including the Governor and
the Board. (**Giglio v. United States** (1972) 450 U.S. 150, 154.)

**E. CONTRACT LAW REQUIRES LESSER PUNISHMENT FOR A PLEA TO A
   LESSER OFFENSE**

    California Penal Code **§1192.1** is therefore an expressly
attached term of Petitioner's plea contract, and the Board and

37

1    Governor, as a part of the California State government, are bound

2    by these terms.

3    > Government prosecutors have the power to bind the sovereign.
     > A prosecutor who reaches a plea agreement binds the government
4    > to that agreement." (**U.S. v. Baksinian** (C.D.Cal. 1999) 65
     > F.Supp.2d 1104, 1106.)

5

6        Therefore, upon reaching a plea agreement the district attorney

7    establishes the accepted circumstances of the commitment offense

8    thereby establishing its degree. Penal Code §1192.1 reads:

9    > Upon a plea of guilty to an information or indictment accusing
     > the defendant of a crime or attempted crime divided into degrees
10   > when consented to by the prosecuting attorney in open Court
     > and approved by the Court, such plea may specify the degree
11   > thereof and in such event the defendant cannot be punished
     > for a higher degree of the crime or attempted crime than the
12   > degree specified.

13      When Petitioner accepted responsibility for his actions, plead

14   guilty and was sentenced to 27 years to life the Court noted the

15   absence of any aggravating or mitigating circumstances:

16   > The Court: There are **no statements in aggravation** or mitigation
     > filed by the Defense or the people. (Emphasis added)

17

18   >     This was a plea?

19   > Defense Counsel: Yes, your honor.

20   > The Court: To a violation of 187, Murder, with the admission of
     > the use of a firearm for a term of 27 years to life. Correct?

21   > Defense Counsel: Correct, your honor.

22   > Prosecuting Attorney: Yes, your honor.

23      The absence of the Court or the prosecution raising aggravating

24   factors or contesting the facts provided in the POR Synopsis

25   of the Crime established that the commitment offense only met

26   the "minimum elements necessary to sustain a conviction". Penal

27   Code section **§3041** is also an express term of Petitioner's plea

28   contract and the Board is bound by it as well. Penal Code **§3041**

                                     38

reads in relevant part:

> One year prior to the inmate's minimum eligible parole date [MEPD] a panel consisting of at least two Commissioners of the Board of Prison Terms shall meet with the inmate and <u>shall normally</u> set a parole release date as provided in section 3041.5. (Emphasis added)

This Penal Code section combined with other evidence provided led Petitioner to reasonably understand that, barring violent misconduct on his part, he would be released on parole at the department computed MEPD.

**F. CONTRACT LAW REQUIRES THE RECIPROCAL BENEFIT OF LESSENED PUNISHMENT**

California's Courts have consistently recognized parties to a plea contract enter into that agreement understanding both will mutually benefit, the State from the defendant's unopposed imprisonment and the defendant by serving a lessor term than that contemplated for the original offense charged. Describing the basis for plea bargains, the Court in **People v. Collins** (1996) 45 Cal.App.4th 849, 862, (**Collins**) noted:

> Both our state Supreme Court and the United States Supreme Court have recognized that a plea bargain is <u>based upon</u> "reciprocal benefit" or "mutuality of advantage between the prosecutor and the defendant (e.g. **People v. Collins** (1978) 21 Cal.3d 208, 214-215, **Brady v. United States** (1970) 397 U.S. 742, 752, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747)" (Emphasis added)

Since a plea bargain is "based upon reciprocal benefit" **Collins** clearly stands for the principle that unless both parties to a plea bargain mutually benefit, there is no plea contract. Previously recognizing this principle, the Court in **People v. Collins** 21 Cal.3d at 214-215, held the concept of "reciprocal benefits" is

1   "critical" to plea agreements, explaining that in exchange for

2   providing the state his uncontested imprisonment, the defendant

3   receives "lessened punishment." **Collins** characterization of

4   reciprocal benefits as critical is instructive. It establishes

5   that exchange of benefits as crucial to plea bargains, thus so

6   essential its absence renders a plea invalid.

7   **G. CALIFORNIA COURTS REQUIRE RECIPROCITY IN PLEA CONTRACTS**

8       Reiterating the State's long standing position that parties to

9   a plea agreement must reciprocally benefit if there is to be a plea

10  contract, the Court in **People v. Rhoden** (1999) 75 Cal.App.4th

11  346, 351, held:

12      Pursuant to this procedure the defendant agrees to plead guilty
        in order to obtain a reciprocal benefit, generally consisting
13      of less severe punishment than that which could result if he
        were convicted of all the offenses charged. [Citation] This
14      more lenient disposition of the charges is secured in part by
        prosecutorial consent to the imposition of clement punishment
15      (**§1192.5**) by the People's acceptance of a plea to a lesser
        offense than that charged, either in degree (**§1192.1**, **§1192.2**)
16      or kind [citation], or by the prosecutor's dismissal of one or
        more counts of a multi-count indictment or information.

17

18      Recognizing the principle of "lessened punishment" is essential

19  to a plea agreement, the Federal Court in **Weaver v. Graham** (1981)

20  450 U.S. 24, 12, 67 L.Ed.2d 17, 25, 101 S.Ct. 460, held that:

21      We previously recognized that a prisoner's eligibility for
        reduced imprisonment is a significant factor entering into
22      both the defendant's decision to plea bargain and, the judge's
        calculation of the sentence to be imposed. **Wolf v. McDonnell**,
23      418 U.S. 539, 557, 41 L.Ed.2d 395, 94 S.Ct. 2693.

24      Punishment reduction for those pleading guilty recognized

25  in **Corbit v. New Jersey** (1978) 489 U.S. 212, 223-224, holding,

26  "[there is] leniency in return for a plea [of guilty], leniency

27  that is denied if one goes to trial, [as] the standard of

28  punishment is necessarily different for those who plead and those

                                    40

1  who go to trial." Addressing the same principles the California

2  Court similarly held in **People v. Cimarusti** (1978) 81 Cal.App.3d

3  314, 323, "[I]t is the function of the executive branch to engage

4  in negotiation with the defense by which a lenient disposition

5  of the charge made is secured without trial." Also see **People v.**

6  **Superior Court for Los Angeles County (Felman)** (1976) 59 Cal.App.3d

7  270 holding, the plea bargain process includes acceptance of a

8  plea of guilty in return for clemency in punishment.

9  **H. PETITIONER'S BELIEF THAT "27 TO LIFE" MEANT 27 YEARS IN**
   **PRISON FOLLOWED BY LIFE ON PAROLE WAS REASONABLE**

10

11    Petitioner believed that he was plea bargaining to receive a

12  determinate sentence of 27 years in prison, followed by a parole

13  period of life. The repeated misadvisements by Trial Counsel as

14  to the content of Petitioner's plea agreement, coupled with the

15  fact that no record exists that the Court or Prosecutor explained

16  that the words "27 to Life" meant something other than "27 years

17  in custody" followed by "life parole" as explained by the Court

18  during sentencing (Exh. D, ST p. 18), rendered Petitioner's

19  guilty plea unknowing and involuntary.

20    A plea's voluntariness can only be determined by considering
      all of the relevant circumstances surrounding it. (**Brady**,

21    supra, at 749.)

22   During plea bargaining negotiations Petitioner was informed by

23  Trial Counsel that he would be assessed a term of 27 years followed

24  by a period of life parole if he plead guilty. Trial counsel went

25  on to explain the base term of 25 years with two additional years

26  for the use of a firearm for a total of 27 years with life parole.

27  The Court, with the approval of the prosecution, then repeated

28  the plea agreement during sentencing:

                                    41

1    The Court: The Probation Department has submitted to this
2    Court a report consisting of some 14 pages, which I have read
     and considered.

3    There are no statements in aggravation or mitigation filed by
     the Defense or the People.
4
5    This was a plea?

6    Defence Counsel: Yes, your honor.

7    The Court: To a violation of 187, Murder, with the admission of
     the use of a firearm for a term of 27 years to life. Correct?

8    Defense Counsel: Correct, your honor.

9    Prosecuting Attorney: Yes, your honor.

10   Whether the prosecutor actively misled the petitioner, or
11   more likely, simply knowingly allowed petitioner to proceed on
     the basis of misapprehension regarding the sentence he would
12   receive, the prosecution must fulfill petitioner's reasonable
     understanding of the plea agreement. (**U.S. v. Hallum**, (9th
13   Cir. 1973) 472 F.2d 168, 169) (Emphasis added)

14   The District Attorney never made an effort to clarify these
15   statements.

16   In the context of the plea in this case, the words "27 to
17   Life" are logically consistent with a prison sentence of 27 years
18   followed by a period of life parole. This logical conclusion was
19   reinforced when the Judge stated in open Court

20   ...that if you are paroled at some time in the future you would
     be on parole for the rest of your life. And your parole would
21   continue in that fashion unless you remain disciplinary free
     of criminal conduct and free of any violations of your parole
22   grant for a continuous period of seven years.

23   Again, neither the District Attorney, nor the Court, provided
24   any additional information or explanation. Petitioner was
25   unfamiliar with the term "27 to Life" and after the Court's
26   statement asked Trial Counsel to explain the judge's statement.
27   Trial counsel explained that in order to be paroled at the minimum
28   time Petitioner would have to remain disciplinary free, work,

                                   42

1 and participate in positive prison programs. If not, then there

2 would be no good time credits off the fixed term of 25 years but

3 that the life parole had to be served whether or not Petitioner

4 served the fixed minimum (MEPD) or maximum term of 25 years.

5 **I. PETITIONER'S REAL UNDERSTANDING OF THE MEANING OF THE PLEA**
**BARGAIN IS SUPPORTED BY DOCUMENTATION PROVIDED BY THE**
6 **DEPARTMENT UPON INITIAL PROCESSING**

7 Petitioner was transferred to the Department of Corrections

8 (now Department of Corrections and Rehabilitation ("CDCR")) and

9 during initial processing was provided a Minimum Eligible Parole

10 Date (MEPD) which is codified in Administrative Law under Title

11 15, Division 2, **§2000** Rules of Construction and Definitions and

12 Division 3, **§3000** Definitions, as "...the earliest date on which

13 an Indeterminate Sentence Law or life prisoner may he legally

14 released on parole."

15 This computed "parole release date" was consistent with the

16 statements provided by Trial Counsel and Petitioner's reasonable

17 understanding of the plea.

18 The process of plea bargaining... contemplates an agreement
negotiated by the People and the defendant approved by the
19 Court... Pursuant to this procedure the defendant agrees to
plead guilty in order to obtain a reciprocal benefit, generally
20 consisting of less severe punishment than that which would
result if he were convicted of all offenses charged. (**People**
21 **v. Orin** (1975) 13 Cal.3d 937, 942.)

22 [Critical to plea bargaining is the concept of reciprocal
benefits ...The benefit to the defendant [is] from lessened
23 punishment. (**People v. Collins** (1978) 21 Cal.3d 208, 214-
215.)
24

25 This parole release date is also consistent with California

26 Appellate Courts decision in **In re Carabes** (144 Cal.App.3d 927,

27 931; 193 Cal.Rptr.2d 65, 68) which held that when a person pleads

28 guilty to a term of imprisonment involving a life term "He must

<div align="center">43</div>

1    be held in prison for a certain minimum period.", in this case

2    the MEPD. At page 68 the Court went further stating:

3        It is unreasonable to assume petitioner will serve a life
         term or a substantial part of a life term beyond the minimum
4        term.

5        The trial Court went to great lengths to explain the period of

6    parole but failed to explain the true meaning of "27 to Life".

7    By concentrating on the "Life" portion of the sentence as meaning

8    life parole and not the "27 to" portion the Court committed

9    prejudicial error.

10       In construing an agreement, the Court must determine what the
         defendant understood when he pleaded guilty. (**United States**
11       **v. Anderson** (9th Cir. 1992) 970 F.2d 602, 607; **United States**
         **v. Packwood** (9th Cir. 1988) 848 F.2d 1009, 1011.) At fn. 7,
12       p. 1337

13       Focusing on the defendant's reasonable understanding also
         reflects the proper constitutional focus on what induced the
14       defendant to plead guilty. Defendant's understanding at time
         of plea, not at sentencing controls. It would be bizarre to
15       look at the time of final performance rather than at the time
         of contract formation in construing the parties intent. **United**
16       **States v. Floyd** (9th Cir 1993) 1 F.3d 867, 870-71.)

17       De La Fuente's acquiesce at sentencing cannot constitute a
         valid mortification because the Court did not engage any of the
18       colloquy ordinarily conducted. (**United States v. De La Fuente**
         (9th Cir. 1993) 8 F.3d 1333)
19

20       Additionally, the District Attorney as "a minister of justice"

21   failed to clarify these statements made by the Court. Petitioner's

22   "objective reasonable expectation" and "reasonable understanding"

23   was release on parole at the CDCR computed MEPD. This was based

24   on his limited knowledge of plea bargains. Petitioner believed

25   that acceptance of the plea bargain would result in "lessened

26   punishment". Basing his knowledge on the fact that criminal

27   defendants who receive a plea bargain receive a lessened sentence

28   than if they went to trial. The fixed sentence they receive is

                                      44

only the maximum time they would serve if not participating in work or educational programs. Through participation the defendant would earn good time credits allowing their release on parole at some time earlier than the maximum fixed sentence. The early release date is called an "earliest possible release date" (EPRD) for non-indeterminately sentenced inmates and MEPD for indeterminately sentenced inmates. The importance of these dates was not discounted by the Board.

> ...If a prisoner is serving both a Life or ISL sentence and a determinate sentence and the determinate sentence release date is later than the statutory MEPD for the Life or ISL sentence, the determinate sentence release date is the MEPD. (Title 15, Div 2, **§2000** Definition for MEPD).

This supports the premise that the MEPD is indeed the earliest date at which an ISL or Life prisoner, in Petitioner's case, may be released on parole.

## J. THE UNITED STATES SUPREME COURT HAS LONG HELD THAT PLEA BARGAINS MUST BE ENFORCED

Due process requirements apply not only to the procedure of accepting the plea but to the implementation of the plea itself.

> When a plea rests in any significant degree on a promise or agreement of the Prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled. (**Santebello**, supra, at 263.)

> Even if it could be said that the terms of the plea bargain were ambiguous the court would be obligated to resolve it in favor of the Petitioner. Black letter law requires that any ambiguity be construed against the drafter of the document - in this case the government. (**Baylock**, supra, at 1468).

> [C]onstruing ambiguities in favor of the defendant makes sense in light of the parties respective bargaining power and expertise. (**De La Fuente**, supra, 1338)

If the plea bargain can be construed in more than one way,

45

1    then it is the interpretation most favorable to the defendant
2    that the court must adopt. (Id.)

### K. THE DEFENDANT SHOULD BE GRANTED SPECIFIC PERFORMANCE OF HIS PLEA BARGAIN

5    In this case there are no written or signed documents, other
6    than the POR and Sentencing Transcripts, with which to evaluate
7    the terms of the agreement. Instead, only the discussion of the
8    specifics occurs in a few lines in open court.

9    Where there has been a violation of the plea bargain itself the
10   defendant is entitled to relief without a showing of prejudice.
     (**Santebello**, supra, at 262-263)

11   The usual remedies available are to allow the defendant to
12   restore the proceedings to the status quo or to specifically
13   enforce the plea agreement. (Id., at 263.) Which remedy is chosen
14   depends upon the individual case. (Id.)

15   In the case at bar, Petitioner cannot be restored to the status
16   quo of being allowed to merely withdraw his plea. Petitioner has
17   already served a substantial portion of his sentence and has
18   passed the MEPD computed by the CDCR. The government has received
19   the benefit of its bargain; now it is time for the Petitioner to
20   receive his reciprocal benefit. The defendant should be granted
21   specific performance of his plea bargain and released on parole.

46

**CONCLUSION**

Petitioner's parole hearing clearly violated his due process rights by re-characterizing the offense, ignoring the plea agreement and failing to find 'some evidence' to support their conclusions and findings. The Board in one breath accepted the circumstances of the offense and then later re-characterized the offense as a crime carrying a more severe penalty (i.e., execution style murder).

The Board, while stating that they accepted the conclusions of the psychological assessment, which found Petitioner's "prognosis for successful adjustment in the community in this case is excellent " (HT p. 53 L. 7) later ignored those very conclusions in the decision.

The panel conducted a "pro forma" hearing giving no actual consideration to the facts of suitability evidenced by their finding of unsuitability based on claims that were unsupported or contradictory to the record.

Petitioner is an excellent example of the type of offender that should be found suitable at the Initial Parole Suitability Hearing as evinced in the Hearing Transcripts.

Petitioner's offense was an anomaly committed under circumstances of extreme stress and mental anguish so improbable that Petitioner's attorney commented on their rarity in the Hearing.

Petitioner led a productive law-abiding life prior to this one event.

//

//

47

**PRAYER FOR RELIEF**

Petitioner is without remedy save for habeas corpus.

Accordingly, Petitioner prays this Court grant the following relief:

1. Enter a declaratory judgement that Petitioner's Due Process rights have been violated by the Board's arbitrary and capricious decision making;

2. Assume jurisdiction over Petitioner's Parole Suitability determination and enforce the terms of the plea agreement;

3. Issue a writ of habeas corpus;

4. Issue an order to show cause;

5. Order this petition expedited

6. Declare the rights of the parties;

7. Appoint counselor or award reasonable fees; and

8. Grant any and all relief the Court deems necessary and appropriate.

Dated: May 23 , 2008

Eric M. Lewis
Petitioner in Pro Per

48

DECLARATION OF SERVICE BY MAIL
(by a person in state custody)
(Fed.R.Civ.P5; 28 U.S.C. § 1746)

RE: LEWIS v. CURRY, Case No. _____

I Eric Lewis, E-29675, declare: I am a resident of the State of California, County of Monterey. I am over the age of 18 years and I am a party to the within action. My residence address is P.O. Box 689, Soledad, California, 93960-0689

On ~~MAY~~ 23, 2008 I served the foregoing PETITION FOR WRIT OF HABEAS CORPUS AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with first class postage fully prepaid in the United States mail at Soledad, California, address as follows:

Original + One Copy

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CA  91402-3483

There is regular mail delivery by the U.S. Postal Service between the place of mailing and the places so addressed.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 23 day of ~~September~~ MAY 2008, at Soledad, California.

_____
ERIC LEWIS
PETITIONER IN PRO PER

PLEASE FILE ACCORDING TO THE "MAILBOX RULE" **HOUSTON v. LACK** (1987) 108 S.Ct. 2379; **KOCK v. RICKETTS** (9TH CIR. 1995) 68 F.3d 1191, ON THE DATE INDICATED ABOVE.

49

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ATTACHMENT I

**In re Donnell Jameison**

Superior Court of Santa Clara County

Case No. 71194

**(ENDORSED)**
**F I L E D**

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

AUG 3 0 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY BRET MORROW, DEPUTY

|  |  |
|---|---|
| In re | No.: 71194 |
| DONNELL JAMEISON, | |
| On Habeas Corpus | ORDER |

## INTRODUCTION

Petitioner alleges that he has been denied due process of law because the Board has used standards and criteria which are unconstitutionally vague in order to find him unsuitable for parole. Alternatively, he argues that those standards, even if constitutionally sound, are nonetheless being applied in an arbitrary and meaningless fashion by the Board. He relies upon evidence that in one hundred percent of 2690 randomly chosen cases, the Board found the commitment offense to be "especially heinous, atrocious or cruel", a factor tending to show unsuitability under Title 15 §2402(c)(1).

## Are the Board Criteria Unconstitutionally Vague?

Our courts have long recognized that both state and federal due process requirements dictate that the Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds. (See *In re Dannenberg* (2005) 34

1   Cal.4th 1061 at p. 1096, footnote 16.)  Those standards are found in

2   15 CCR §2402(c) (*Dannenberg, supra,* 34 Cal.4th at p. 1080,) and do

3   include detailed criteria to be applied by the Board when considering

4   the commitment offense:

> (c) Circumstances Tending to Show Unsuitability. The following
> circumstances each tend to indicate unsuitability for release.
> These circumstances are set forth as general guidelines; the
> importance attached to any circumstance or combination of
> circumstances in a particular case is left to the judgment of
> the panel. Circumstances tending to indicate unsuitability
> include:
>
> (1) Commitment Offense. The prisoner committed the offense in an
> especially heinous, atrocious or cruel manner. The factors to be
> considered include:
>
>> (A) Multiple victims were attacked, injured or killed in
>> the same or separate incidents.
>>
>> (B) The offense was carried out in a dispassionate and
>> calculated manner, such as an execution-style murder.
>>
>> (C) The victim was abused, defiled or mutilated during or
>> after the offense.
>>
>> (D) The offense was carried out in a manner which
>> demonstrates an exceptionally callous disregard for human
>> suffering.
>>
>> (E) The motive for the crime is inexplicable or very
>> trivial in relation to the offense.

In response to Petitioners claim that the regulations are

impermissibly vague, Respondent argues that while "especially

heinous, atrocious or cruel" might be vague in the abstract it is

limited by factors (A)-(E) of §2402(c)(1), and thus provides a

'principled basis' for distinguishing between those cases which are

contemplated in that section and those which are not.  An examination

of cases involving vagueness challenges to death penalty statutes is

instructive here and shows that Respondent's position has merit:

"Our precedents make clear that a State's capital sentencing

1    scheme also must genuinely narrow the class of persons eligible
     for the death penalty. When the purpose of a statutory
2    aggravating circumstance is to enable the sentencer to
     distinguish those who deserve capital punishment from those who
3    do not, the circumstance must provide a principled basis for
     doing so. If the sentencer fairly could conclude that an
4    aggravating circumstance applies to every defendant eligible for
     the death penalty, the circumstance is constitutionally infirm."
5    (*Arave v. Creech* (1993) 507 U.S. 463, 474, citing *Maynard v.
     Cartwright* (1988) 486 U.S. 356, 364: "invalidating aggravating
6    circumstance that 'an ordinary person could honestly believe'
     described every murder," and, *Godfrey v. Georgia* (1980) 446 U.S.
7    420, 428-429: "A person of ordinary sensibility could fairly
     characterize almost every murder as 'outrageously or wantonly
8    vile, horrible and inhuman.'")

9

10   It cannot fairly be said that 'every murder' could be

11   categorized as "especially heinous, atrocious or cruel" under the

12   Board regulations, since the defining factors contained in

13   subdivisions (A)-(E) clearly narrow the group of cases to which it

14   applies. Although Petitioner also argues that the "vague statutory

15   language is not rendered more precise by defining it in terms or

16   synonyms of equal or greater uncertainty" *(People v. Superior Court*

17   *(Engert)* (1982) 31 Cal.3d 797, 803, *Pryor v. Municipal Court* (1979)

18   25 Cal.3d 238, 249. *See also Walton v. Arizona* (1990) 497 U.S. 639,

19   654), the factors in those subdivisions are not themselves vague or

20   uncertain. The mere fact that there may be some subjective component

21   (such as "exceptionally callous" disregard for human suffering) does

22   not render that factor unconstitutionally vague. The proper degree

23   of definition of such factors is not susceptible of mathematical

24   precision, but will be constitutionally sufficient if it gives

25   meaningful guidance to the Board.

26       A law is void for vagueness if it "fails to provide adequate
         notice to those who must observe its strictures and
27       impermissibly delegates basic policy matters to policemen,
         judges, and juries for resolution on an ad hoc and subjective
         basis, with the attendant dangers of arbitrary and

28

discriminatory application." *(People v. Rubalcava* (2000) 23
Cal.4th 322, 332, quoting *People ex rel. Gallo v. Acuna* (1997)
14 Cal. 4th 1090, 1116, quoting *Grayned v. City of Rockford*
(1972) 408 U.S. 104, 108-109.)

A review of cases expressing approval of definitions to limit the

application of otherwise vague terms in death penalty statutes leads

inextricably to the conclusion that the limiting factors in §2402(c)

easily pass constitutional muster.  An Arizona statute was upheld

that provided a crime is committed in an 'especially cruel manner'

when the perpetrator inflicts mental anguish or physical abuse before

the victim's death," and that "mental anguish includes a victim's

uncertainty as to his ultimate fate." *(Walton v. Arizona* (1990) 497

U.S. 639, 654.)  Similarly, the court in *Maynard* v. *Cartwright*, 486

U.S. at 364-365, approved a definition that would limit Oklahoma's

"especially heinous, atrocious, or cruel" aggravating circumstance to

murders involving "some kind of torture or physical abuse.  In

Florida, the statute authorizing the death penalty if the crime is

"especially heinous, atrocious, or cruel," satisfied due process

concerns where it was further defined as "the conscienceless or

pitiless crime which is unnecessarily torturous to the victim."

*State v. Dixon* (1973) 283 So. 2d 1 at p. 9.

Here, the factors in subdivisions (A)-(E) provide equally clear

limiting construction to the term "especially heinous, atrocious, or

cruel" in §2402(c).

**Has the Board Engaged in a Pattern of Arbitrary Application of the
Criteria?**

As previously noted, 15 CCR §2402 provides detailed criteria for

determining whether a crime is "exceptionally heinous, atrocious or

cruel" such that it tends to indicate unsuitability for parole.  Our

1  courts have held that to fit within those criteria and thus serve as

2  a basis for a finding of unsuitability, the circumstances of the

3  crime must be more aggravated or violent than the minimum necessary

4  to sustain a conviction for that offense. (*In re Rosenkrantz* (2002)

5  29 Cal.4th 616, 682-683.) Where that is the case, the nature of the

6  prisoner's offense, *alone,* can constitute a sufficient basis for

7  denying parole. (*In re Dannenberg, supra,* 34 Cal.4th at p. 1095.)

8      Petitioner claims that those criteria, even if constitutionally

9  sound, have been applied by the Board in an arbitrary and capricious

10  manner rendering them devoid of any meaning whatever. The role of

11  the reviewing court under these circumstances has been addressed

12  previously in the specific context of Parole Board actions:

> "[Courts have] an obligation, however, to look beyond the facial
> validity of a statute that is subject to possible
> unconstitutional administration since a law though fair on its
> face and impartial in appearance may be open to serious abuses
> in administration and courts may be imposed upon if the
> substantial rights of the persons charged are not adequately
> safeguarded at every stage of the proceedings. We have
> recognized that this court's obligation to oversee the execution
> of the penal laws of California extends not only to judicial
> proceedings, but also to the administration of the Indeterminate
> Sentence Law." *(In re Rodriguez* (1975) 14 Cal.3d 639, 648,
> quoting *Minnesota v. Probate Court* (1940) 309 U.S. 270, 277.)

20      Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case

21  closest on point to the present situation, the California Supreme

22  Court stated: "This court has traditionally accepted its

23  responsibility to prevent an authority vested with discretion from

24  implementing a policy which would defeat the legislative motive for

25  enacting a system of laws." Where, as here, the question is whether

26  determinations are being made in a manner that is arbitrary and

27  capricious, judicial oversight "must be extensive enough to protect

28

1  limited right of parole applicants 'to be free from an arbitrary

2  parole decision... and to something more than mere pro-forma

3  consideration.'" (*In re Ramirez* (2001) 94 Cal.App.4th 549 at p. 564,

4  quoting *In re Sturm* (1974) 11 Cal.3d 258 at p. 268.)

5      This Court, therefore, now examines Petitioner's "as applied"

6  void for vagueness challenge.

7

8                    **The Evidence Presented**

9      A similar claim to those raised here, involving allegations of

10  abuse of discretion by the Board in making parole decisions, was

11  presented to the Court of Appeal in *In re Ramirez, supra.* The court

12  there observed that such a "serious claim of abuse of discretion"

13  must be "adequately supported with evidence" which should be

14  "comprehensive." (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5.)

15  The claim was rejected in that case because there was not "a

16  sufficient record to evaluate." (*Ibid.*) In these cases, however,

17  there is comprehensive evidence offered in support of Petitioner's

18  claims.

19      Discovery orders were issued in five different cases involving

20  life term inmates (Petitioners) who all presented identical claims.[1]

21

---

[1] This Court takes judicial notice of the several other cases currently
pending (Lewis #68038, Criscione #71614, Bragg #108543, Ngo #127611.) which
raise this same issue and in which proof was presented on this same point.
(Evidence Code § 452(d). See specifically, in the habeas corpus context,
*In re Vargus* (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
notice was taken of the evidence in four other cases and in which the court
noted: "Facts from other cases may assist petitioner in establishing a
pattern." See generally *McKell v. Washington Mutual, Inc.* (2006) 142
Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take
judicial notice of ... established facts from both the same case and other
cases." And see *AB Group v. Wertin* (1997) 59 Cal.App.4th 1022, 1036:
Judicial notice taken of other cases when matters are "just as relevant to
the present [case] as they are to the others.")

6

1  The purpose of the discovery was to bring before the Court a

2  comprehensive compilation and examination of Board decisions in a

3  statistically significant number of cases.  The Board decisions under

4  examination consisted of final decisions of the Board for life-term

5  inmates convicted of first or second degree murder and presently

6  eligible for parole.  Included were all such decisions issued in

7  certain months, chosen by virtue of their proximity in time to the

8  parole denials challenged in the pending petitions.  All Board

9  decisions in the months of August, September and October of 2002,

10 July, August, September, October, November, and December of 2003,

11 January and February of 2004, February of 2005, and January of 2006

12 were compiled.  This resulted in a review of 2690 cases decided in a

13 total of 13 months.

14      The purpose of the review was to determine how many inmates had

15 actually been denied parole based in whole or in part on the Board's

16 finding that their commitment offense fits the criteria set forth in

17 Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A

18 member of the research team conducting the review, Karen Rega,

19 testified that in its decisions the Board does not actually cite CCR

20 rule §2402(c), but consistently uses the specific words or phrases

21 ("verbiage from code") contained therein, so that it could easily be

22 determined when that criteria was being applied.  (For example,

23 finding "multiple victims" invokes §2402(c)(1)(A); finding the crime

24 "dispassionate" "calculated" or "execution style" invokes

25 §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"

26 invokes §2402(c)(1)(C);  a crime that is "exceptionally callous" or

27 demonstrated a "disregard for human suffering" fits criteria

28

1  §2402(c)(1)(D); and finding the motive for the crime "inexplicable"

2  or "trivial" invokes §2402(c)(1)(E).)

3      Petitioners provided charts, summaries, declarations, and the

4  raw data establishing the above in the cases of Lewis #68038,

5  Jameison #71194, Bragg #108543, and Ngo #127611.  In another case,

6  (Criscione #71614) the evidence was presented somewhat differently.

7  Both to spread the burden of the exhaustive examination, and to

8  provide a check on Petitioners' methods, this Court ordered

9  Respondent to undertake an examination of two randomly chosen months

10 in the same manner as Petitioner had been doing.  Respondent complied

11 and provided periodic updates in which they continued to report that

12 at all "the relevant hearings the Board relied on the commitment

13 offense as a basis for denying parole."  (See "Respondent's Final

14 Discovery Update" filed April 5, 2007.)  At the evidentiary hearing

15 on this matter counsel for Respondents stipulated that "in all of

16 those cases examined [by Respondent pursuant to the Criscione

17 discovery orders] the Board relied on the commitment offense as a

18 basis for denying parole."  (See pages 34-35 of the June 1, 2007,

19 evidentiary hearing transcript.)

20     The result of the initial examination was that in over 90

21 percent of cases the Board had found the commitment offense to be

22 "especially heinous, atrocious or cruel" as set forth in Title 15

23 §2402(c)(1).  In the remaining 10% of cases either parole had been

24 granted, or it was unclear whether §2402(c)(1) was a reason for the

25 parole denial.  For all such cases, the decisions in the prior

26 hearing for the inmate were obtained and examined.  In every case,

27 the Board had determined at some point in time that every inmates

28

A

1  crime was "especially heinous, atrocious or cruel" under Title 15

2  §2402(c)(1).

3      Thus, it was shown that 100% of commitment offenses reviewed by

4  the Board during the 13 months under examination were found to be

5  "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6      A further statistic of significance in this case is that there

7  are only 9,750 inmates total who are eligible for, and who are

8  currently receiving, parole consideration hearings as life term

9  inmates.  (See "Respondent's Evidentiary Hearing Brief," at p. 4,

10  filed April 16, 2007.)

11

12                    <u>**USE OF STATISTICS**</u>

13      In *International Brotherhood of Teamsters v. United States*

14  (1977) 431 U.S. 324, 338-340, the United States Supreme Court

15  reaffirmed that statistical evidence, of sufficient "proportions,"

16  can be sound and compelling proof.  As noted by the court in *Everett*

17  *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited

18  therein, "courts regularly have employed statistics to support an

19  inference of intentional discrimination."

20      More recently, the United States Supreme Court, in *Miller-El v.*

21  *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas

22  petitioner's allegations that the prosecutor was illegally using his

23  peremptory challenges to exclude African-Americans from the

24  petitioner's jury, noted that "the statistical evidence alone" was

25  compelling.  The high court analyzed the numbers and concluded:

26  "Happenstance is unlikely to produce this disparity."  (See also

27  *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

28

1 evidence" was noted as possibly being dispositive.  And see *People* v.

2 *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and

3 analysis, combined into an "actuarial instrument" was substantial

4 proof.)

5     A statistical compilation and examination such as has been

6 presented in these cases is entirely appropriate and sufficient

7 evidence from which to draw sound conclusions about the Board's

8 overall methods and practices.

9

10                  **THE EXPERT'S TESTIMONY**

11     Petitioners provided expert testimony from Professor Mohammad

12 Kafai regarding the statistics and the conclusions that necessarily

13 follow from them.  Professor Kafai is the director of the statistics

14 program at San Francisco State University, he personally teaches

15 statistics and probabilities, and it was undisputed that he was

16 qualified to give the expert testimony that he did.  No evidence was

17 presented that conflicts or contradicts the testimony and conclusions

18 of Professor Kafai.  By stipulation of the parties, Professor Kafai's

19 testimony was to be admissible and considered in the cases of all

20 five petitioners.  (See page 35 of the June 1, 2007, evidentiary

21 hearing transcript.)

22     Professor Kafai testified that the samples in each case, which

23 consisted of two or three months of Board decisions, are

24 statistically sufficient to draw conclusions about the entire

25 population of life term inmates currently facing parole eligibility

26 hearings.  Given that every inmate within the statistically

27 significant samples had his or her crime labeled "'particularly

28

10

1  egregious'" or "especially heinous, atrocious or cruel" under Title

2  15 §2402(c)(1), it can be mathematically concluded that the same

3  finding has been made for every inmate in the entire population of

4  9,750. Although he testified that statisticians never like to state

5  unequivocally that something is proven to a 100% certainty, (because

6  unforeseen anomalies are always theoretically possible,) he did

7  indicate the evidence he had thus far examined came as close to that

8  conclusion as could be allowed. Not surprisingly, Professor Kafai

9  also testified that "more than 50% can't by definition constitute an

10  exception."

11       Having found the data provided to the expert to be sound this

12  Court also finds the expert's conclusions to be sound. In each of

13  the five cases before the Court over 400 inmates were randomly chosen

14  for examination. That number was statistically significant and was

15  enough for the expert to draw conclusions about the entire population

16  of 9,750 parole eligible inmates. The fact that the approximately

17  2000 inmates examined in the other cases also had their parole denied

18  based entirely or in part on the crime itself (§2402(c)(1)), both

19  corroborates and validates the expert's conclusion in each individual

20  case and also provides an overwhelming and irrefutable sample size

21  from which even a non expert can confidently draw conclusions.

22

23                         **DISCUSSION**

24       Although the evidence establishes that the Board frequently says

25  parole is denied "first," "foremost," "primarily," or "mainly,"

26  because of the commitment offense, this statement of primacy or

27  weight is not relevant to the question now before the Court.

28

1  Petitioners acknowledge that the Board generally also cites other

2  reasons for its decision.  The question before this Court, however,

3  is not whether the commitment offense is the primary or sole reason

4  why parole is denied -- the question is whether the commitment

5  offense is labeled "'particularly egregious'" and thus could be used,

6  under *Dannenberg,* primarily or exclusively to deny parole.

7      The evidence proves that in a relevant and statistically

8  significant period where the Board has considered life term offenses

9  in the context of a parole suitability determination, every such

10  offense has been found to be "particularly egregious" or "especially

11  heinous, atrocious or cruel."[2]  This evidence conclusively

12  demonstrates that the Board completely disregards the detailed

13  standards and criteria of §2402(c).  "Especially" means particularly,

14  or "to a distinctly greater extent or degree than is common."[3]  (EC §

15  451(e).)  By simple definition the term "especially" as contained in

16  section 2402(C)(1) cannot possibly apply in 100% of cases, yet that

17  is precisely how it has been applied by the Board.  As pointed out by

18  the Second District Court of Appeal, not every murder can be found to

19  be "atrocious, heinous, or callous" or the equivalent without "doing

20

21  [2] In a single case out of the 2690 that were examined Petitioner has conceded that
the Board did not invoke §2402(c)(1).  This Court finds that concession to be
improvidently made and the result of over caution.  When announcing the decision at

22  the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin
by stating "I don't believe this offense is particularly aggravated..."  However
the commissioner proceeds to describe the crime as a drug deal to which Fletcher

23  brought a gun so "we could say there was some measure of calculation in that."  The
commissioner continued by observing that the reason someone would bring a gun to a

24  drug transaction was to make sure things went according to their plan "so I guess
we can say that that represents calculation and perhaps it's aggravated to that
extent."  As is the Board's standard practice, by using the word 'calculated' from

25  §2402(c)(1)(b) the Board was invoking that regulation.  Certainly if Mr. Fletcher
had brought a habeas petition Respondent's position would be that there is 'some

26  evidence' supporting this.  The ambiguity created by the commissioner's initial
statement was cleared up several pages later when he announces that "based upon the
crime coupled with ..." parole was denied for four years.  (See *In re Burns* (2006)

27  136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
year denial.)

28

1  violence" to the requirements of due process. (*In re Lawrence* (2007)

2  150 Cal.App.4th 1511, 1557.) This is precisely what has occurred

3  here, where the evidence shows that the determinations of the Board

4  in this regard are made not on the basis of detailed guidelines and

5  individualized consideration, but rather through the use of all

6  encompassing catch phrases gleaned from the regulations.

7

8  **THE BOARD'S METHODS**

9     Because it makes no effort to distinguish the applicability of

10  the criteria between one case and another, the Board is able to force

11  every case of murder into one or more of the categories contained in

12  §2402(c).

13     For example, if the inmate's actions result in an instant death

14  the Board finds that it was done in a "dispassionate and calculated

15  manner, such as an execution-style murder." At the same time the

16  Board finds that a murder not resulting in near instant death shows a

17  "callous disregard for human suffering" without any further analysis

18  or articulation of facts which justify that conclusion. If a knife

19  or blunt object was used, the victim was "abused, defiled, or

20  mutilated." If a gun was used the murder was performed in a

21  "dispassionate and calculated manner, such as an execution-style

22  murder." If bare hands were used to extinguish another human life

23  then the crime is "particularly heinous and atrocious."

24     Similarly, if several acts, spanning some amount of time, were

25  necessary for the murder the Board may deny parole because the inmate

26  had "opportunities to stop" but did not. However if the murder was

27  _____

[3] Princeton University World Net Dictionary (2006).

28

1   accomplished quickly parole will be denied because it was done in a

2   dispassionate and calculated manner and the victim never had a chance

3   to defend themselves or flee.  If the crime occurred in public, or

4   with other people in the vicinity, it has been said that the inmate

5   "showed a callous disregard" or "lack of respect" for the

6   "community."  However if the crime occurs when the victim is found

7   alone it could be said that the inmate's actions were aggravated

8   because the victim was isolated and more vulnerable.

9        In this manner, under the Board's cursory approach, every murder

10  has been found to fit within the unsuitability criteria.  What this

11  reduces to is nothing less than a denial of parole for the very

12  reason the inmates are present before the Board - i.e. they committed

13  murder.  It is circular reasoning, or in fact no reasoning at all,

14  for the Board to begin each hearing by stating the inmate is before

15  them for parole consideration, having passed the minimum eligible

16  parole date based on a murder conviction, and for the Board to then

17  conclude that parole will be denied because the inmate committed acts

18  that amount to nothing more than the minimum necessary to convict

19  them of that crime.  As stated quite plainly by the Sixth District:

20  "A conviction for murder does not automatically render one unsuitable

21  for parole."  (*Smith, supra*, 114 Cal.App.4th at p. 366, citing

22  *Rosenkrantz, supra,* 29 Cal.4th at p. 683.)

23       In summary, when every single inmate is denied parole because

24  his or her crime qualifies as an §2402(c)(1) exception to the rule

25  that a parole date shall normally be set, then the exception has

26  clearly swallowed the rule and the rule is being illegally

27  interpreted and applied.  When every single life crime that the Board

28

1  examines is "particularly egregious" and "especially heinous,

2  atrocious or cruel" it is obvious that the Board is operating without

3  any limits and with unfettered discretion.

4      Other examples of the failure to 'connect up' the facts of the

5  individual case with the criteria and the ultimate findings abound in

6  the decisions of the reviewing courts. Some of the state cases to

7  have reversed Parole Board or Governor abuses of discretion in

8  denying parole include *In re Roderick, In re Cooper, In re Lawrence,*

9  *In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In*

10  *re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith,* and *In*

11  *re Capistran.*

12      When "the record provides no reasonable grounds to reject, or

13  even challenge, the findings and conclusions of the psychologist and

14  counselor concerning [the inmate's] dangerousness" the Board may not

15  do so. (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16      When an inmate, although only convicted of a second degree

17  murder, has been incarcerated for such time that, with custody

18  credits, he would have reached his MEPD if he had been convicted of a

19  first, the Board must point to evidence that his crime was aggravated

20  or exceptional even for a first degree murder if they are going to

21  use the crime as a basis for denying parole. (*In re Weider* (2006)

22  145 Cal.App.4th 570, 582-583.)[4]

23

24  [4]    This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra,* is
particularly applicable in the case of Arthur Crisione. Petitioner was convicted
of second degree, but acquitted of first degree, murder over 25 years ago. (*People*
25  *v. Criscione* (1981) 125 Cal.App.3d 275.) With his custody credits he is beyond the
matrix even had he been convicted of a first. In a currently pending habeas
26  petition in which he challenges his 2007 parole denial the first reason the Board
gave was the crime itself and the presiding commissioner explained: "His actions go
27  well beyond the minimum necessary for a conviction of murder in the second degree."
 (Decision page 2 of 4/2/07 transcript.) For the Board to penalize the Petitioner
for the fact that he was acquitted of first degree is further proof of their

28

1    A "petitioner's young age at the time of the offense" must be

2  considered.  (*In re Elkins* (2006) 144 Cal.App.4th 475, 500, quoting

3  *Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,

4  1085: "The reliability of the facts of the crime as a predictor for

5  his dangerousness was diminished further by his young age of 18, just

6  barely an adult. 'The susceptibility of juveniles to immature and

7  irresponsible behavior means their irresponsible conduct is not as

8  morally reprehensible as that of an adult.'")[5]

9    The Board's formulaic practice of stating §2402(c)(1) phrased in

10 a conclusory fashion, and then stating "this is derived from the

11 facts" without ever linking the two together, is insufficient.  (*In*

12 *re Roderick*, (2007) ____ Cal.App.4th ____ (A113370): "At minimum, the

13 Board is responsible for articulating the grounds for its findings

14 and for citing to evidence supporting those grounds." (See also *In*

15 *re Barker* (2007) 151 Cal.App.4th 346, 371, disapproving

16 "conclusorily" announced findings.)

17    After two decades, mundane "crimes have little, if any,

18 predictive value for future criminality.  Simply from the passing of

19 time, [an inmate's] crimes almost 20 years ago have lost much of

20 their usefulness in foreseeing the likelihood of future offenses than

21 if he had committed them five or ten years ago." (*In re Lee* (2006)

22 143 Cal.App.4th 1400, 1412.)  It should be noted that this rule

23 _____

24 willfulness and bias.  The jury had a reasonable doubt that Petitioner committed
   first degree murder but under the Board's 'reasoning' and 'analysis' this puts him
   in a worse position than if they had not.  Had the jury convicted him of the

25 greater offense Petitioner has served so much time that he would already be having
   subsequent parole hearings on a first and the Board would not have been able to use
   the 'some evidence' of first degree behavior against him.  As observed previously,

26 the Board's position in this regard is "so ridiculous that simply to state it is to
   refute it." (*Weider, supra*, 145 Cal.App.4th at p. 583.)

27 [5] This point is particularly significant in the case of Mike Ngo.  Mr. Ngo was only
   18 at the time of his crime.  The impetus behind the shooting was youth group or

28

1  applies with even more force when the Board is relying on any

2  criminality that occurred before the crime.  In that situation, just

3  as with the crime itself, the Board must explain why such old events

4  have any relevance and especially when the inmate has spent a decade

5  as a model prisoner.

6      Murders situationally related to intimate relationships are

7  unfortunately commonplace because emotions are strongest in such

8  domestic settings.  When a murder occurs because of "stress unlikely

9  to be reproduced in the future" this is a factor that affirmatively

10  points towards suitability.  (*In re Lawrence* (2007) 150 Cal.App.4th

11  1511 and cases cited therein.)

12      "The evidence must substantiate the ultimate conclusion that the

13  prisoner's release currently poses an unreasonable risk of danger to

14  the public.  It violates a prisoner's right to due process when the

15  Board or Governor attaches significance to evidence that forewarns no

16  danger to the public." (*In re Tripp* (2007) 150 Cal.App.4th 306,

17  313.)

18      The Board "cannot rely on the fact that the killing could have

19  been avoided to show the killing was especially brutal."  (*In re*

20  *Cooper* (2007) 153 Cal.App.4th 1043, 1064.)

21      The Board's focus must be upon how the inmate "actually

22  committed his crimes" not the "incorporeal realm of legal

23  constructs." (*Lee, supra,* 143 Cal.App.4th at p. 1413.)  This is

24  especially significant when the murder conviction is based on the

25  felony murder rule, provocative act doctrine, or accomplice liability

26  such that the inmate did not intend to kill or may not have even been

27  _____

   gang rivalries, posturing, and threats which mature adults would not have been

28

1  the actual killer.

2        The Board has ample guidance before it in the decisions of the

3  various reviewing courts to constrain its abuse, but has failed to

4  avail itself of the opportunity to do so.

5

6                    **SEPARATION OF POWERS DOCTRINE**

7        The evidence presented, as discussed above, has established a

8  void for vagueness "as applied" due process violation.  That same

9  evidence also proves a separate but related Constitutional violation

10  -- an as applied separation of powers violation.

11        The separation of powers doctrine provides "that the legislative

12  power is the power to enact statutes, the executive power is the

13  power to execute or enforce statutes, and the judicial power is the

14  power to interpret statutes and to determine their

15  constitutionality."  (*Lockyer v. City and County of San Francisco*

16  (2004) 33 Cal.4th 1055, 1068.)  Because the evidence has proven the

17  Board is not executing/enforcing the legislature's statutes as

18  intended it is this Court's duty to intervene.  The question here is

19  whether the Board is violating the separation of powers doctrine by

20  appropriating to itself absolute power over parole matters and

21  disregarding the limits and guidelines placed by the statute.[6]

22        "Government Code section 11342.2 provides: 'Whenever by the

23  ─────────────────────────────────────────────

24  caught up in.
    [6] "It is settled that Administrative regulations that violate acts of the
    Legislature are void and no protestations that they are merely an exercise of

25  administrative discretion can sanctify them.  They must conform to the legislative
    will if we are to preserve an orderly system of government.  Nor is the motivation

26  of the agency relevant: It is fundamental that an administrative agency may not
    usurp the legislative function, no matter how altruistic its motives are."

27  (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16
    Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of
    San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

28

1  express or implied terms of any statute a state agency has authority

2  to adopt regulations to implement, interpret, make specific or

3  otherwise carry out the provisions of the statute, no regulation

4  adopted is valid or effective unless consistent and not in conflict

5  with the statute and reasonably necessary to effectuate the purpose

6  of the statute.'  Administrative regulations that alter or amend the

7  statute or enlarge or impair its scope are void and courts not only

8  may, but it is their obligation to strike down such regulations."

9  (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75

10  Cal.App.4th 1315, 1341, citations omitted.)

11      The vice of overbroad and vague regulations such as are at issue

12  here is that they can be manipulated, or 'interpreted,' by executive

13  agencies as a source of unfettered discretion to apply the law

14  without regard to the intend of the people as expressed by the

15  legislature's enabling statutes.  In short, agencies usurp unlimited

16  authority from vague regulations and become super-legislatures that

17  are unaccountable to the people.  As it has sometimes been framed and

18  addressed in the case law, a vague or all encompassing standard runs

19  the risk of "violat[ing] the separation of powers doctrine by

20  'transforming every [executive decisionmaker] into a "mini-

21  legislature" with the power to determine on an ad hoc basis what

22  types of behavior [satisfy their jurisdiction].'"  (*People v. Ellison*

23  (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*

24  *(Caswell)* (1988) 46 Cal.3d 381, 402.)

25      "It is concern about 'encroachment and aggrandizement,' the

26  [United States Supreme Court] reiterated, that has animated its

27  separation of powers jurisprudence.  'Accordingly, we have not

28

1  hesitated to strike down provisions of law that either accrete to a

2  single Branch powers more appropriately diffused among separate

3  Branches or that undermine the authority and independence of one or

4  another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th

5  472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,

6  382.)  This articulation of the principle speaks directly to the

7  situation at hand.  The Board, by its enactment and interpretation of

8  Title 15, §2402, has appropriated to itself absolute power over

9  'lifer' matters.  Overreaching beyond the letter and spirit of the

10  Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by

11  the Board to supply the power to declare every crime enough to deny

12  parole forever.  The fact that Title 15, §2402, has been invoked in

13  every case, but then sometime later not invoked, tends to show either

14  completely arbitrary and capricious behavior or that unwritten

15  standards are what really determine outcomes.  In either event, all

16  pretenses of taking guidance from, or being limited by, the

17  legislature's statutes have been abandoned.  "[I]t is an elementary

18  proposition that statutes control administrative interpretations."

19  (*Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 78.)

20  Title 15 §2402 as applied, however, has no controls or limitations.

21      The PC § 3041(b) exception to the rule can only be invoked when

22  the "gravity of the current convicted offense or offenses, or the

23  timing and gravity of current or past convicted offense or offenses,

24  is such that consideration of the public safety requires a more

25  lengthy period of incarceration for this individual."  The word

26  "gravity" is a directive for comparison just as "more lengthy"

27  indicates a deviation from the norm.  While *Dannenberg* held there

28

1    does not need to be intra case comparison for the purposes of term

2    uniformity or proportionality, there necessarily has to be some sort

3    of comparison for the purposes of adhering to the legislative mandate

4    that parole is available.  The Board employs no meaningful yardstick

5    in measuring parole suitability.  This is a violation of the

6    separation of powers doctrine.  (*People v. Wright* (1982) 30 Cal.3d

7    705, 712-713.  And see *Terhune v. Superior Court* (1998) 65

8    Cal.App.4th 864, 872-873.  Compare *Whitman v. Am. Trucking Ass'ns*

9    (2001) 531 U.S. 457, 472, describing a delegation challenge as

10   existing when the legislature fails to lay down "an intelligible

11   principle to which the person or body authorized to act is directed

12   to conform.")

13

14                    **RESPONDENT'S POSITION**

15        The Attorney General has suggested, without pointing to any

16   concrete examples, that it is possible that the Board, when invoking

17   the crime as a reason to deny parole, is not placing it within

18   §2402(c)(1) but instead using is as some sort of 'lesser factor'

19   which, only when combined with other unsuitability criteria, can

20   contribute to a valid parole denial.  The two problems with this

21   position are, first, there is no evidentiary support for this

22   assertion, and second, it would have no impact on the constitutional

23   infirmities outlined and proven above.

24        Even if Respondent had produced evidence that the Board was

25   utilizing the crime as a 'lesser factor' which needs others to fully

26   support a parole denial, the Board would then be admitting it was

27   denying parole, in part, for the very reason that the person is

28

1  before the panel and eligible for parole in the first place – the
2  commitment offense.  Respondent's argument suggests that a crime that
3  only qualified as the *Dannenberg* "minimum necessary" could still be
4  invoked as a reason for denying parole.  Respondent argues that when
5  the crime is invoked 'not in the *Dannenberg* sense,' there must be
6  other reasons for the parole denial and the crime alone would not be
7  enough in this context.  This position is inconsistent with the law
8  and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly
10  egregious," or one where "no circumstances of the offense reasonably
11  could be considered more aggravated or violent than the minimum
12  necessary to sustain a conviction for that offense."  (*Dannenberg,*
13  *supra,* 34 Cal.4th at pp. 1094-1095.)  These are the only two choices.
14   If a crime consists of only the bare elements then it is not
15  aggravated and it cannot, in and of itself, serve as a basis for
16  parole denials once the inmate becomes eligible for parole.  It is
17  the reason an inmate may be incarcerated initially for the equivalent
18  of 15 or 25 years, and then examined to determination rehabilitation
19  efforts when they come before the Board, but a crime that is no more
20  than the bare minimum cannot be factored into the equation pursuant
21  to PC § 3041(b) or any of the case law interpreting it.

22      In oral argument Respondent suggested a second way the
23  commitment offense can be used outside of §2402(c)(1).  If for
24  example a crime had its roots in gang allegiances or rivalries and
25  the inmate continued to associate with gangs while incarcerated, then
26  an aspect of the crime, even if the crime otherwise consisted of no
27  more than the minimum elements, could be combined with other behavior
28

1  to support a parole denial.  Similarly, if a crime was rooted in an

2  inmate's then existing drug addiction, and the Board was to point to

3  a recent 115 involving drugs, the evidence that the inmate's drug

4  issues had not been resolved would justify a parole denial even if

5  the crime itself was not aggravated.  A finding that the inmate is

6  not suitable for release under these circumstances, however, is not

7  based on the facts of the commitment offense as tending to show

8  unsuitability.  It is based on the conclusion that can be drawn about

9  Petitioner's lack of rehabilitation or change since the offense, and

10  thus, his present dangerousness.

11      Respondent has not demonstrated any flaws in Petitioner's

12  methodology or analysis, nor provided any actual evidence of the

13  crime being invoked *other* than pursuant to §2402(c)(1).  Drawing

14  conclusions from the Board's direct statements, or its precise

15  recitations of the §2402(c)(1) language, logically indicates an

16  invocation of §2402(c)(1), and Respondent's suggestion otherwise is

17  insupportable.

18

19                    **THE QUESTION OF BIAS**

20      Because the issue has been squarely presented, and strenuously

21  argued by Petitioners, this Court is obligated to rule on the charge

22  that the Board's actions prove an overriding bias and deliberate

23  corruption of their lawful duties.

24      In the discrimination and bias case of *USPS Bd. of Governors v.*

25  *Aikens* (1983) 460 U.S. 711, the United States Supreme Court

26  acknowledged "there will seldom be 'eyewitness' testimony as to the

27  [] mental processes" of the allegedly biased decisionmaker.  Instead,

28

                              22

1  an examination of other cases for trends or patterns can provide the

2  necessary circumstantial evidence.  (See *Aikens, supra*, at footnote

3  2.)  Reaffirming that such circumstantial evidence will be sufficient

4  the Court stated: "The law often obliges finders of fact to inquire

5  into a person's state of mind.  As Lord Justice Bowen said in

6  treating this problem in an action for misrepresentation nearly a

7  century ago, 'The state of a man's mind is as much a fact as the

8  state of his digestion.  It is true that it is very difficult to

9  prove what the state of a man's mind at a particular time is, but if

10  it can be ascertained it is as much a fact as anything else.'"

11  (*Aikens*, at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29

12  Ch. Div. 459, 483.)[7]

13      The discovery in these cases was granted in part due to the

14  Petitioners' prima facie showing of bias and the necessity that it be

15  "adequately supported with evidence" if such evidence is available.

16  (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5.  See also *Nasha v.

17  City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking

18  to show bias or prejudice on the part of an administrative decision

19  maker is required to prove the same 'with concrete facts.'"  And see

20  *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,

21  841: "The challenge to the fairness of the adjudicator must set forth

22  concrete facts demonstrating bias or prejudice."  See also *Hobson v.*

23

24  [7] As occurred in *Aikens, supra*, and as suggested in prior orders of this Court, Respondent should have provided direct evidence from the decisionmakers.  While the fact that a *Defendant* does not explain his or her actions cannot be held against him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S.

25  610,) it is appropriate to give some weight to the consideration that the Board has failed to offer any direct evidence or explanation on its own behalf.  While the

26  case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the proposition that Petitioner may not inquire into the Board members mental

27  processes, Respondent is not precluded from offering such direct evidence if they were able to testify as to their good faith and conscientious efforts.

28

1  *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.

2  school desegregation case in which the court determined from a

3  statistical and factual analysis that racial bias was influencing

4  policy.)

5      In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,

6  a similar claim of biased decision making was asserted and it was

7  rejected because, although the defendant clearly articulated it, "he

8  has not demonstrated it. Therefore, he has failed to bear his burden

9  of showing a constitutional violation as a demonstrable reality, not

10  mere speculation." In the present cases Petitioners have provided

11  overwhelming concrete evidence. It is difficult to believe that the

12  Board's universal application of §2402(c)(1) has been an inadvertent

13  mistake or oversight on their part. It is hard to credit the Board's

14  position that it does not know its own patterns and practices reveal

15  a complete lack of standards or constraints on their power.

16  Respondent's protestations ring hollow, and it seems a statistical

17  impossibility, that the Board's use of "detailed" criteria in such a

18  fashion that they are rendered meaningless is a result of good faith

19  efforts on their part. That every murder is "especially heinous,

20  atrocious or cruel," and can therefore be an exception to the rule

21  that a parole date should be set, does not seem to be an accident on

22  their part.

23      Although no court has thus far agreed with the accusation that

24  the Board approaches its duties with a predetermination and a bias,

25  no court has previously been presented the comprehensive evidence

26  outlined herein. While this Court does not turn a blind eye to the

27  reasonable conclusion that the Board's unconstitutional practices are

28

1    willful, there is another possibility. The pattern of errors

2    demonstrated by the discovery in this case, and the continuously

3    growing body of Court of Appeal opinions finding consistent and

4    persistent abuse of discretion, may instead be caused by the fact

5    that the Board is simply overworked and substantively untrained. The

6    impossibility of the blanket applicability of §2402(c)(1) may be only

7    the result of sloppy preparation and inadvertent carelessness.

8        The Board must first be given an opportunity to comply with the

9    necessary remedy provided by this court before it is possible to

10   enter a finding of conscious bias and illegal sub rosa policy. To do

11   otherwise would ignore the complexities and magnitude of the largely

12   discretionary duties with which that Board is vested.

13

14                            CONCLUSION

15       The conclusive nature of the proof in this case, and the

16   suggestion of institutional bias do not preclude formulation of an

17   remedy which will guarantee adequate restrictions on, and guidance

18   for, the Board's exercise of discretion in making parole suitability

19   determinations. The Board can be made to lawfully perform its duties

20   if given explicit instructions.

21       As noted supra, a reason the proof in this case irrefutably

22   establishes constitutional violations is because the Board does not,

23   in actual fact, operate within the limiting construction of the

24   regulations. The Board's expansive interpretation allows it to

25   operate without any true standards. Although numerous rulings of

26   both state and federal courts of appeal have invalidated the Board's

27   application of the §2402(c) criteria to particular facts, the Board

28

1  does not take guidance from these binding precedents and ignores them

2  for all other purposes.  In the most recent of these cases, *In re*

3  *Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District

4  held four of five §2402 factors "found" by the Board to be

5  unsupported by any evidence.  At footnote 14 the court took the time

6  to criticize the Board for its repeated use of a "stock phrase"

7  "generically across the state."  The court also clarified that "at

8  minimum, the Board is responsible for articulating the grounds for

9  its findings and for citing to evidence supporting those grounds."

10     There is nothing in the evidence presented that would allow any

11  conclusion but that, without intervention of the Courts, the Board

12  will ignore the lessons of these rulings in the future and continue

13  to employ its formulaic approach of citing a criteria from

14  §2402(c)(1), repeating the facts of the crime, but never

15  demonstrating a logical connection between the two.  This is the

16  core problem with the Board's methodology -- they provide no

17  explanation or rationale for the findings regarding the crime itself.

18  This practice results in violence to the requirements of due

19  process and individualized consideration which are paramount to the

20  appropriate exercise of its broad discretion.

21     The only solution is one that compels the Board to identify the

22  logical connection between the facts upon which it relies and the

23  specific criteria found to apply in the individual case.   For

24  example, the Board often finds that an inmate's motive is "trivial"

25  without ever suggesting why, on these facts, that motive is not just

26  as trivial as the motive behind any other murder.  What motive is not

27  trivial?  By any definition "trivial" is a word of comparison and

28

1  only has meaning when there can be examples that are not "trivial."

2     Similarly, although the Sixth District made it plain four years

3  ago that "all [] murders by definition involve some callousness," (*In*

4  *re Smith* (2003) 114 Cal.App.4th 343, 345,) the Board has continued to

5  deny countless paroles labeling the crime "callous" without ever

6  suggesting what crime would not qualify as "callous" and without

7  consistently explaining why the individual case before it

8  demonstrates "exceptional" callousness.

9     Respondent has consistently refused to suggest what possible

10  instances of murder would *not* fit the Board's amorphous application

11  of the §2402 criteria. Citing *Dannenberg*, Respondent insists such

12  comparative analysis is unnecessary. Respondent fundamentally

13  misunderstands the *Dannenberg* holding.

14     The PC § 3041(b) exception to the rule can only be invoked when

15  the "gravity of the current convicted offense or offenses, or the

16  timing and gravity of current or past convicted offense or offenses,

17  is such that consideration of the public safety requires a more

18  lengthy period of incarceration for this individual." The word

19  "gravity" is a directive for comparison just as "more lengthy"

20  indicates a deviation from the norm. While *Dannenberg* held there

21  does not need to be intra case comparison for the purposes of term

22  uniformity or proportionality, there necessarily has to be some sort

23  of comparison for the purposes of adhering to the legislative mandate

24  that parole is available. This is implicit in §2402 because the

25  qualifier "especially," in "especially heinous atrocious or cruel,"

26  requires that some form of comparison be made. While the original

27  drafters of §2402 seemed to have recognized this fact, the ongoing

28

1  conduct of the Board has completely ignored it, and this is the

2  essence of the due process violation Petitioners have asserted.

3      As noted in his dissent in the recent case of *In re Roderick,*

4  *supra,* Justice Sepulveda would have deferred to the Board's

5  'exercise' of discretion because "Board members have both training

6  and vast experience in this field. They conduct literally thousands

7  of parole suitability hearings each year. The Board therefore has

8  the opportunity to evaluate the egregiousness of the facts of a great

9  number of commitment offenses. ... The Board's training and

10  experience in evaluating these circumstances far exceeds that of

11  most, if not all, judges." The evidence in this case, however,

12  suggests a flaw in granting such deference. Since the Board

13  continues to place every murder in the category of offenses "tending

14  to show unsuitability," something is certainly wrong. Since the

15  Board's vast experience is undeniable, the problem must be in the

16  Board's training and understanding of the distinguishing features of

17  the guidelines and criteria. Although Justice Sepulveda presumes

18  that Board members receive substantive training, there is no evidence

19  before this court to suggest that it does, and substantial

20  circumstantial evidence to suggest that it does not.

21      In the vast numbers of Santa Clara County cases reviewed by this

22  Court, the Board's formulaic decisions regarding the commitment

23  offense do not contain any explanation or thoughtful reasoning.

24  Instead, the Board's conclusionary invocation of words from

25  §2402(c)(1) is linked to a repetition of the facts from the Board

26  report by the stock phrase: "These conclusions are drawn from the

27  statement of facts wherein ..." Thereafter the inmate files a habeas

28

1 corpus petition and Respondent, after requesting an extension of

2 time, files a boilerplate reply asserting the Board's power is

3 "great" and "almost unlimited" and thus any "modicum" of evidence

4 suffices.  Respondent does not cite or distinguish the expanding body

5 of case law that is often directly on point as to specific findings

6 made.  Thereafter, if the writ is granted, the Board is directed to

7 conduct a new hearing "in compliance with due process" and that order

8 is appealed by Respondent.  On appeal the order is usually upheld

9 with modifications and in the end, after countless hours of attorney

10 and judicial time, the Board conducts a new two hour hearing at which

11 they abuse their discretion and violate due process in some different

12 way.

13     This system is malfunctioning and must be repaired.  The

14 solution must begin with the source of the problem.  The Board must

15 make efforts to comply with due process in the first instance.  The

16 case law published over the last five years provides ample and

17 sufficient guidelines and must be followed.  Although the Board

18 methods suggest it believes this to be optional, it is not.

19

20                              **THE REMEDY**

21     Thus, it is the order of this Court that the Board develop,

22 submit for approval, and then institute a training policy for its

23 members based on the current and expanding body of published state,

24 and federal, case law reviewing parole suitability decisions, and

25 specifically the application of §2402 criteria.  In addition to

26 developing guidelines and further criteria for the substantive

27 application of §2402 the Board must develop rules, policies and

28

1 │ procedures to ensure that the substantive guidelines are followed.

2 │     This Court finds its authority to impose this remedy to flow

3 │ from the fundamental principles of judicial review announced over two

4 │ centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5 │ Citing that landmark case, the California Supreme Court has

6 │ recognized "Under time-honored principles of the common law, these

7 │ incidents of the parole applicant's right to 'due consideration'

8 │ cannot exist in any practical sense unless there also exists a remedy

9 │ against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10 │     In *Strum* the court directed that the Board modify its rules and

11 │ procedures so that thereafter "The Authority will be required [,]

12 │ commencing with the finality of this opinion, to support all its

13 │ denials of parole with a written, definitive statement of its reasons

14 │ therefor and to communicate such statement to the inmate concerned."

15 │ (*Sturm* at p. 273.)

16 │     Similarly, in the case of *Minnis, supra*, the California Supreme

17 │ Court held the Board's policy of categorically denying parole to drug

18 │ dealers was illegal.  Based on its analysis the court there was

19 │ clearly prepared to order that Board to modify its rules and

20 │ procedures however such was unnecessary because the Board

21 │ "voluntarily rescinded" the illegal policy.  While the remedy in this

22 │ case is of greater scope than that necessary in either *Strum* or

23 │ *Minnis, supra*, so too has been the showing of a systematic abuse of

24 │ discretion and distortion of process.

25 │     The most recent case to address the court's roles and duties in

26 │ overseeing the parole suitability process has been *In re Rosenkrantz,*

27 │ *supra,* 29 Cal.4th 616.  In that case the court explained that

28 │

1    judicial review of a Governor's parole determination comports with,

2    and indeed furthers; separation of powers principles because the

3    courts are not exercising "complete power" over the executive branch

4    and do not "defeat or materially impair" the appropriate exercise or

5    scope of executive duties. (*Rosenkrantz* at p. 662.)  Citing *Strum,*

6    *supra*, the court reaffirmed that a life term inmate's "due process

7    rights cannot exist in any practical sense without a remedy against

8    its abrogation." (*Rosenkrantz* at p. 664.)

9        The *Rosenkrantz* court also put forth what it believed was an

10   extreme example but which, unfortunately, has been shown to exist in

11   this case.  The court stated: "In the present context, for example,

12   judicial review could prevent a Governor from usurping the

13   legislative power, in the event a Governor failed to observe the

14   constitutionally specified limitations upon the parole review

15   authority imposed by the voters and the Legislature."  This is

16   exactly what the evidence in this case has proven.  As noted above

17   the Board has arrogated to itself absolute authority, despite

18   legislative limitations and presumptions, through the mechanism of a

19   vague and all inclusive, and thus truly meaningless, application of

20   standards.  The remedy this Court is imposing is narrowly tailored to

21   redress this constitutional violation.

22       The consequence of the Board's actions (of giving § 2402(c)(1)

23   such a broadly all encompassing and universal application) is that

24   they have unwittingly invalidated the basis of the California Supreme

25   Court's holding in *Dannenberg*.  The reason the four justice majority

26   in *Dannenberg* upheld the Board's standard operating procedures in the

27   face of the Court of Appeal and dissent position is because "the

28

1  Board must apply detailed standards when evaluating whether an

2  individual inmate is unsuitable for parole on public safety grounds."

3  (*Dannenberg* at p. 1096, footnote 16.  See also page 1080: "the

4  regulations do set detailed standards and criteria for determining

5  whether a murderer with an indeterminate life sentence is suitable

6  for parole.")  However, Petitioners in these cases have proven that

7  there are no "detailed standards" at all.  Instead the Board has

8  systematically reduced the "detailed standards" to empty words.  The

9  remedy this Court orders, that there truly be "detailed standards,"

10 requires the promulgation of further rules and procedures to

11 constrain and guide the Board's powers.  This remedy differs in

12 specifics, but not in kind, from what courts have previously imposed

13 and have always had the power to impose.

14       The Board must fashion a training program and further rules,

15 standards and regulations based on the opinions and decisions of the

16 state and federal court cases which provide a limiting construction

17 to the criteria which are applied.[8]  The Board must also make

18 provisions for the continuing education of its commissioners as new

19 case law is published and becomes binding authority.  This Court will

20 not, at this point, outline the requirements and lessons to be taken

21 from the above cases.  It is the Board's duty, in the first instance

22 to undertake this task.  The training program, and associated rules

23 and regulations, shall be served and submitted to this Court, in

24 ─────────────────────

[8]While the showing and analysis in this case was limited to § 2402(c)(1), the
25 conclusions that the evidence compelled, that the Board has been carelessly
distorting and misapplying the regulations, is not so limited.  Accordingly, the
26 training program that is necessary for the Board can not reasonably be limited to
just § 2402(c)(1).  Thus, to the extent case law recognizes, clarifies and
27 establishes remedies for other due process violations they must also be
incorporated into the necessary rules and training the Board is required to abide
by.

28

1  writing, within 90 days.  Counsel for Petitioners, and any other

2  interested parties, may submit briefs or comments within 30 days

3  thereafter.  After receipt and review of the materials this Court

4  will finalize the training program, and associated rules, and the

5  Petitioners in these cases shall receive a new hearing before a Board

6  that does not operate with the unfettered discretion and caprice

7  demonstrated by the evidence here presented.

8                              **ORDER**

9       For the above reasons the habeas corpus petition is granted and

10 it is hereby ordered that Petitioner be provide a new hearing which

11 shall comply with due process as outlined above.  Respondent shall

12 provide weekly updates to this Court on the progress of its

13 development of the new rules and regulations outlined above.

14

15

16

17 DATED:  *Aug 30*, 2007

18                          LINDA R. CONDRON
                            JUDGE OF THE SUPERIOR COURT

19

20 cc:  Petitioner's Attorney (Jacob Burland)
        Attorney General (Denise Yates, Scott Mather)

21

22

23

24

25

26

27 ─────────────────────────────────────────

28

                              34

# IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
# IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| In the Matters of<br><br>**ARTHUR CRISCIONE**<br><br><div align="right">Petitioners On Habeas Corpus.</div> | **(ENDORSED)**<br># FILED<br>AUG 3 0 2007<br><br>KIRI TORRE<br>Chief Executive Officer/Clerk<br>Superior Court of CA County of Santa Clara<br>By: BRET MORROW, DEPUTY |
| PROOF OF SERVICE BY MAIL OF: | |
| **ORDER OF COURT (Penal Code §871.5)** | **CASE NOS.:**<br>**71614** |

## CLERK'S CERTIFICATE OF SERVICE

I CERTIFY THAT I AM NOT A PARTY TO THIS CAUSE AND THAT A TRUE COPY OF THIS DOCUMENT, *ORDER OF COURT [Penal Code §871.5]),* WAS HAND-DELIVERED INTO THE BELOW-LISTED AGENCY'S INTER-OFFICE PICK-UP BOX, (WHERE APPLICABLE), OR MAILED WITH FIRST CLASS POSTAGE PREPAID IN A SEALED ENVELOPE ADDRESSED AS SHOWN BELOW, AND THESE DOCUMENTS WERE PLACED FOR PICK-UP OR MAILED AT SAN JOSE, CALIFORNIA ON DATE SHOWN BELOW.

DATED: _____AUG 3 0 2007_____          KIRI TORRE, CHIEF EXECUTIVE OFFICER/CLERK

BY: _____BRET MORROW_____

Bret Morrow, Deputy Courtroom Clerk

| | |
|---|---|
| **Petitioners:**<br>Morris Bragg, Viet Ngo, Donnell Jameison,<br>Arthur Criscione, Donnie Lewis<br><br>c/o<br>Jacob Burland, Esq.<br>Law Offices of Jacob Burland<br>3790 Via de la Valle, Suite 103E<br>Del Mar, CA 92014 | **Respondent:**<br>Scott Mather, Deputy Attorney General<br>Denise A. Yates, Deputy Attorney General<br>OFFICE OF THE ATTORNEY GENERAL<br>455 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102-7004 |
| **CJIC:**<br><br>(Placed in inter-department pick-up box) | **RESEARCH:**<br><br>(Placed in inter-department pick-up box) |

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**CORRECTIONAL TRAINING FACILITY**
**INMATE TRUST OFFICE**
P. O. BOX 686
SOLEDAD, CA  93960-0686



Date:   June 12, 2008

*E-filing*

Clerk of the Court
U. S. District Court
Northern District
450 Golden Gate Avenue
San Francisco, CA  94102

Attached you will find a check for $5.00 for habeas corpus for Mr. Eric Lewis, CDCR#
E29675 along with his application and required documents.  You will also find a self-
addressed, stamped envelope.

Thank you in advance.  If you have any questions, feel free to contact me at (831) 678-
3951 ext. 4529.

Yolanda Chavez
Yolanda Chavez
Accountant 1 Specialist

ERIC LEWIS          E-29675
P.O. BOX 689        BW-237L
SOLEDAD, CA         93960-0689

Date: May 23, 2008

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CA   94102-3483

RE: **LEWIS v. CURRY**,  Case No. __CV  08     3009 MMC (PR)__

Dear Clerk of the Court,

I, ERIC LEWIS, E-29675, Petitioner in pro per, am requesting that my **PETITION FOR WRIT OF HABEAS CORPUS AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** be filed in accordance with the "MAILBOX RULE" (**HOUSTON v. LACK**, (1987) 108 S.Ct. 2379; **KOCK v. RICKETTS**, (9TH Cir. 1995) 68 F.3d 1191), on the date it was delivered to the prison authorities as evinced by the Proof of Service and the dated signature of the Corrections Authority on the seal of the envelope.

I would appreciate it if you would put the Case Number and Date Filed on the extra copy of the cover page enclosed with this letter and return it to me.

I have included a Self Addressed Stamped Envelope for this purpose and the Court s convenience.

I thank you for you time and assistance in this matter.


Respectfully,

_____  Dated May 23, 2008
ERIC LEWIS
Petitioner in pro per



UNITED STATES POSTAGE
$ 0.41
02 1M
0004429613
MAILED FROM ZIPCODE

Office of the Clerk
United Staes District Court
Northern District of California

450 Golden Gate Avenue
San Francisco, Calif   94102-3483

Eric Lewis
E29675  B-237-L
PO Box 689
Soledad, Calif   93960-0689